# United States Court of Appeals
## For the First Circuit

No. 14-1794

UNITED STATES OF AMERICA,

Appellee,

v.

LUZ M. VEGA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Rachel Brill, for appellant.
Héctor E. Ramírez-Carbo, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Juan Carlos Reyes-Ramos, Assistant United States Attorney, were on brief, for appellee.

March 2, 2016

**TORRUELLA**, **Circuit Judge**. A jury convicted defendant-appellant Luz M. Vega of fifty-eight criminal counts stemming from her participation in a Medicare fraud scheme. Vega now appeals her convictions from the United States District Court for the District of Puerto Rico, alleging several procedural defects. Additionally, although Vega does not challenge her Medicare fraud convictions, she argues the Government did not present sufficient evidence to convict her of identity theft and money laundering. For the reasons that follow, we affirm.

## I. Background

Vega was the director of Preferred Medical Equipment ("Preferred"), a supplier of durable medical equipment ("DME") located in Arecibo. DME are items used by individuals with certain medical conditions outside of a hospital on regular basis, such as wheelchairs, walkers, orthotics, and electric hospital beds. Typically, a patient obtains DME through a DME supplier upon the presentation of a physician order. If the patient is a Medicare beneficiary, the DME supplier can submit a claim to Medicare for partial reimbursement.[1]

---

[1] In the Medicare claim, the DME supplier states how much the beneficiary was billed for the equipment. Up to a set price point, Medicare will fully reimburse a DME supplier, factoring in an expected twenty-percent copay by the beneficiary.

DME suppliers seeking reimbursement from Medicare must submit documentation with their claim, including proof that the DME ordered was medically necessary and prescribed by a physician. Due to the volume of claims received, Medicare does not verify every claim it receives beyond checking for paperwork showing that the DME recipient was a Medicare beneficiary and the DME was medically necessary.

Preferred defrauded Medicare by submitting claims for DME orders that were not medically necessary. Rather than waiting for beneficiaries to come with physician orders to fulfill, "equipment coordinators" at Preferred would seek out Medicare beneficiaries and persuade them to receive DME, often under the pretense that the equipment was free. The absence of documentation showing the DME ordered was medically necessary would normally prevent Medicare reimbursement. Preferred's equipment coordinators circumvented this rule by paying a doctor, Francisco A. Garrastegui-Bigas ("Garrastegui"), to provide the required documentation. Garrastegui would either create documentation for DME already ordered, or accompany the equipment coordinators on patient visits and prescribe DME on the spot.

The Government jointly indicted Vega; Garrastegui; Preferred's secretary, María Elisa Pérez; and two of Preferred's equipment coordinators, Lissette Acevedo-Rodríguez ("Acevedo") and

Luisa Nieves, alleging that Preferred submitted ninety-five false claims totaling $210,223.47 to Medicare between April 2010 and March 2011. For her role in this scheme, the Government charged Vega with one count of conspiracy to commit Medicare fraud in violation of 18 U.S.C. §§ 1347 and 1349 and twenty-four counts of aiding and abetting the commission of health care fraud in violation of 18 U.S.C. §§ 2 and 1347.[2]

Vega also faced several other criminal charges in connection with her participation in Preferred's fraud scheme. For payments made to Preferred's equipment coordinators and Garrastegui, Vega was charged with twenty-eight counts of aiding and abetting the solicitation and receipt of kickbacks in relation to the Medicare program, in violation of 42 U.S.C. §§ 2 and 1320a-7b(b)(1)(B). Vega paid commissions to Preferred's equipment coordinators based on the type and quantity of DME they sold. Additionally, Vega paid Garrastegui to visit Preferred's office in late 2010 to create medical documentation for DME that Preferred had sold without physician orders.[3]

_____

[2] These twenty-four counts were based on claims Preferred filed for DME given to three different beneficiaries.

[3] Count 29 was in regard to Vega paying Garrastegui for when he visited Preferred's office. Counts 30-54 were in regards to payments Vega made to Acevedo. Counts 55-56 were in regard to payments Vega made to Nieves.

The Government also charged Vega with three counts of aiding and abetting aggravated identify theft in violation of 18 U.S.C. § 1028A(a)(1) and (2). These aggravated identity theft charges were in relation to Preferred obtaining the identification information of three Medicare beneficiaries -- Juan Quiles-Medina ("Quiles"), José Figueroa-Class ("Figueroa"), and Efraín Toro-Morales ("Toro") -- and continuing to bill Medicare on their behalf even after they told Preferred they did not want the equipment.

Finally, Vega was charged with two counts of transacting in criminally derived property of a value greater than $10,000 (i.e., money laundering) because she used funds from Preferred's bank account to pay for personal expenses (an auto loan and the purchase of an official check).

Garrastegui and Acevedo both pled guilty and testified against Vega at trial. The jury found Vega guilty of all counts. The district court sentenced Vega to two years and one day of imprisonment and three years of supervised release. This timely appeal followed.

## II. Napue Claims

Vega first argues that the Government violated Napue v. Illinois, 360 U.S. 264 (1959), and her right to due process by allowing two of its witnesses to provide false testimony to the jury. Napue prohibits prosecutors from knowingly presenting false

evidence, including false testimony, to the jury. Id. at 269-70; see also United States v. Flores-Rivera, 787 F.3d 1, 31 (1st Cir. 2015). This prohibition applies even if the government does not solicit the false testimony and merely fails to correct it. Napue, 360 U.S. at 269.

According to Vega, two of Preferred's equipment coordinators who testified against her at trial, Acevedo and Marcos A. Sárraga-Montañez ("Sárraga"), underrepresented the benefits they received from their plea agreements.[4] This in turn, Vega argues, prevented the jury from fully assessing their bias and credibility. We reject Vega's Napue claims for two reasons.

First, we note that Vega did not object to Acevedo's or Sárraga's testimony, even though the Government entered their plea agreements into evidence at trial and, as discussed in further detail below, the plea agreements contained all of the information Vega needed to impeach their testimony. If a defendant has actual knowledge of the false testimony and fails to correct it, absent unusual circumstances, we assume the defendant did so for strategic

---

[4] Acevedo and Sárraga were also involved in a similar Medicare fraud scheme with a different DME supplier called Monte Mar. Acevedo was charged in connection with Monte Mar and Preferred and pled guilty to one count of conspiracy to commit health care fraud in both cases and one count of aggravated identity theft in the Preferred case. Sárraga was only charged in connection with Monte Mar and pled guilty to one count of soliciting and receiving kickbacks in relation to the Medicare program in that case.

reasons and consider the Napue claim waived.  United States v. Mangual-García, 505 F.3d 10, 10-11 (1st Cir. 2007).  Given the availability of the plea agreements, we do not think Vega has reason to complain about either witness's testimony on appeal.

Second, even if Vega's claims are reviewable, they are meritless.

## A.  Acevedo's Testimony

Vega contests a portion of Acevedo's testimony elicited on recross-examination.  Following Acevedo's statement that she was repentant, Vega asked Acevedo if she "ha[d] to return the money that [she] received" from her crimes; Acevedo, who had yet to be sentenced, stated that she did not know.  The district court then told the jury that Acevedo's plea agreement, whatever its terms, was not binding and that the court "c[ould] order full restitution" and it was "up to the Court, the amount of restitution."

Vega argues that the prosecutors (and district court with its comment) left the jury with an impression that Acevedo did not receive a benefit from the Government by pleading guilty because restitution was still up to the district court's discretion.  This impression is false, according to Vega, because discretionary restitution is a benefit.

Vega premises her argument on the Mandatory Victim's Restitution Act ("MVRA"), 18 U.S.C. § 3663A, which requires

-7-

defendants to pay restitution in fraud cases. See id. § 3663A(c)(1)(ii); United States v. Cheal, 389 F.3d 35, 53 (1st Cir. 2004). Vega argues that Acevedo's plea agreements must have exempted her from the MVRA if the prosecutors and district court viewed her restitution as a matter of court discretion.

The problem with Vega's argument is that Acevedo's plea agreements did not exempt her from the MVRA -- in fact, her plea agreements explicitly state that the MVRA applied. The benefit Vega argues Acevedo lied about receiving simply does not exist.[5]

We also find no falsity in Acevedo's statement that she did not know the amount of restitution she would have to pay. Restitution has a precise legal definition. It is not unreasonable that Acevedo would not know this definition and thus how the district court would calculate restitution or how much it would order her to pay. Finally, we fail to see how any problems with Acevedo's testimony could not have been impeached by Vega when Vega had a copy of Acevedo's plea agreement and the plea agreement stated the terms of Acevedo's restitution and monetary penalties. Based on this review of the record, we conclude that

---

[5] Vega seems to argue that because Acevedo ultimately did not pay any restitution she must have been exempted from the MVRA. The district court's restitution calculation is not before us and Vega has failed to point us to any evidence suggesting that the plea agreement terms were altered prior to sentencing. We therefore assume the MVRA applied pursuant to the plea agreement's terms.

Acevedo's testimony was not false and therefore did not violate Napue.

**B.  Sárraga's Testimony**

Our review of the record also leads us to conclude that Sárraga's testimony did not violate Napue. Sárraga's contested testimony came during his redirect examination when the prosecution attempted to bolster his credibility following Vega's attacks on cross-examination:

> PROSECUTOR: And you have already been sentenced . . .; is that correct?
>
> SÁRRAGA: Yes.
>
> PROSECUTOR: So what do you have to lose or win by coming here to testify?
>
> SÁRRAGA: From the very first time that I had contact with an agent, I decided that I was going to tell the truth and made a commitment to tell the truth and help them out.
>
> PROSECUTOR: Are you getting anything in return or do you fear something will happen to you by coming here and testifying today?
>
> SÁRRAGA: No.

Vega argues that Sárraga's statement that he was not receiving anything in return for his testimony was false because he was still on probation and was required to pay restitution and thus had an incentive to "please the government with his testimony."

Like Acevedo's testimony, we do not see any obvious falsity in Sárraga's statement. Sárraga had already been

-9-

sentenced such that the main source of his bias -- wanting to receive a favorable recommended sentence from the prosecution -- was mitigated. The prosecution's ability to influence Sárraga's probation and restitution seems attenuated at best. Moreover, even if Sárraga's statement that he was receiving nothing in return for his testimony was misleading, Vega could easily cross-examine his motives -- and in fact did so. See United States v. Clark, 767 F. Supp. 2d 12, 67 (D.D.C. 2011) (stating conflicting testimony between witnesses did not create Napue claim because even if a witness's testimony contains falsehoods, "cross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony" (quoting United States v. Joyner, 201 F.3d 61, 82 (2d Cir. 2000)). Thus, even if Sárraga's testimony could be construed as misleading, we do not find "any reasonable likelihood" that the testimony could "have affected the judgment of the jury.[6] Mangual-García, 505 F.3d at 10 (quoting

---

[6] We also reject Vega's argument that the district court made an improper and misleading comment to the jury about plea agreements generally. While Sárraga was describing his plea agreement on direct, the district court interjected and told the jury:

> You've heard other witnesses who are cooperating with the United States and have plea agreements, they have not yet been sentenced. The sentence is ultimately for the Court to decide, and the fact that [Sárraga] got 18 months is not indicative of how any of the other individuals will be sentenced that's ultimately a decision for the Court on a case-by-case-basis.

-10-

Giglio v. United States, 405 U.S. 150, 154 (1972)).  As a result, we proceed to Vega's evidentiary claims.

### III.  **Evidentiary Issues**

Vega next argues that the Government improperly introduced expert testimony without qualifying the witnesses as experts.  Vega's claim relates to the testimony of two Government witnesses: Jean Stone ("Stone") and Special Agent Michael Ayala ("Ayala").  We are dubious about the propriety of portions of their testimony, but ultimately find Vega's alleged errors harmless given her theory of defense.

Stone held a management position with the United States Department of Health and Human Services, where she helped oversee Medicare fraud prevention activities in New York, New Jersey, Puerto Rico, and the Virgin Islands.  Stone did not assist with the investigation of Vega or Preferred -- rather, the Government gave Stone a copy of the indictment against Vega and asked Stone to testify about the Medicare program generally.  During the

---

Vega argues this statement was misleading because the witnesses were assigned to the same judge and he ultimately gave other witnesses the same sentence as Sárraga (eighteen months' probation).  Vega claims the district court judge's statement prevented her from arguing that other witnesses would not face jail time.  We do not see how the district court's statement was false given that each sentence was up to the court's discretion. And, similar to Vega's claim regarding Sárraga's testimony, we do not see how Vega was prevented from making any arguments about witness bias on cross-examination.

course of her testimony, Stone described the structure of the Medicare program; how DME was prescribed and could be obtained by patients; how DME suppliers received reimbursement; and how Preferred's Medicare reimbursement claims showed conflicting DME prescriptions.[7]

On appeal, Vega contests the portion of Stone's testimony in which she described the anti-kickback statute. Stone testified that a DME supplier could not pay an equipment coordinator commissions because the anti-kickback statute made it illegal "to offer or receive anything of value for referrals of Medicare or Medicaid patient [sic] to receive Medicare service or equipment."

Vega contests a similar statement made by Ayala, a U.S. Secret Service agent who executed a search warrant of Preferred's office in April 2011. At trial, Ayala testified he found a chart during the search that listed different DME, the price Preferred paid for DME, the amount Medicare reimbursed for that DME, and a column called "Rep. Payment."[8] Ayala testified that he believed

---

[7] For example, Stone stated that one of Preferred's claim forms ordered both a pressure-reducing mattress -- used for immobile patients who developed severe ulcers due to the pressure from their bones pressing on their skin -- and a back brace -- used to help patients' spines recover following surgery. As Stone explained, it was not appropriate for a patient who was immobile to also have a device used to stabilize a walking patient.

[8] The chart contained some Spanish terms. Translated versions of

that (1) the chart showed Preferred paid its equipment coordinators based on the equipment they sold; (2) these payments were kickbacks; and (3) kickbacks were prohibited by Medicare law.

Vega argues that the Government needed to qualify Stone and Ayala as expert witnesses pursuant to Federal Rule of Evidence 702 in order for them to testify about whether Preferred paid its equipment coordinators commissions and whether such commissions were prohibited by 42 U.S.C. § 1320a-7b(b)(1)(B).[9]  Federal Rule of Evidence 701 limits opinion testimony by lay witnesses to opinions that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).  Vega argues Stone and Ayala's testimony was based on technical or specialized knowledge.  The Government counters it was not.

In support of its view, the Government notes we have allowed police officers to offer opinions based on the "particularized knowledge [the officers had] by virtue of [their] position[s]" without being qualified as experts.  United States

---

these charts are part of the trial record.

[9]  The Government argues that Vega failed to preserve both of her claims on appeal because she failed to contemporaneously object during Stone or Ayala's testimony.  We find the record ambiguous.  Because we find any error harmless even under the "manifest abuse of discretion" standard, we do not address this point.  United States v. Valdivia, 680 F.3d 33, 50 (1st Cir. 2012).

v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005) (quoting Fed. R. Evid. 701, advisory committee's note on 2000 amendment).  The Government argues that Stone and Ayala gained familiarity with the anti-kickback statute through their jobs and thus their testimony fit within the ambit of "particularized knowledge" gained "by virtue of [their] positions."

The Government reads too much into our precedent.  We acknowledge that we have previously stated that Rule 701 "is meant to admit testimony based on the lay expertise a witness personally acquires through experience, often on the job."  United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006).  We have not stated, however, that all job-based knowledge is nontechnical or nonspecialized.  Rather, we have stated that lay experiential expertise refers to those processes that are "well founded on personal knowledge and susceptible to cross-examination."  Ayala-Pizarro, 407 F.3d at 28 (quoting United States v. Vega-Figueroa, 234 F.3d 744, 755 (1st Cir. 2000)).  Such lay expertise is "the product of reasoning processes familiar to the average person in everyday life."  United States v. García, 413 F.3d 201, 215 (2d Cir. 2005).  For example, a police officer noticing patterns of behavior across criminal operations uses straightforward logic to conclude a defendant's behavior fits within that pattern and thus, does not need to be qualified as an expert.  See United States v.

<u>Santiago</u>, 560 F.3d 62, 66 (1st Cir. 2009) (holding that officer could testify about meaning of code words used during drug transactions based on hearing same language in other drug investigation as lay witness); <u>Ayala-Pizarro</u>, 407 F.3d at 28-29 (finding officer could testify as lay witness that defendant was at "drug point" based on observation that location was heavily guarded because no specialized expertise was required for officer to reach the conclusion that "places which sell drugs are often protected by people with weapons").

The testimony in this case helps illustrate this distinction between experiential knowledge that relies on reasoning processes familiar to the average person and more specialized expertise. On the one hand, Ayala's testimony about his interpretation of the chart he found at Preferred could be properly admitted as lay testimony. A jury could follow the reasoning process Ayala used and understand why he interpreted a chart listing medical equipment and containing a column reading "Rep. payment" as evidence that Preferred's equipment coordinators were paid based on the equipment they sold. Such testimony relying upon logic and pattern recognition falls within Rule 701's parameters for lay testimony.

In contrast, we find that Stone's testimony and Ayala's final conclusion that Preferred's commissions violated Medicare

law fell outside the boundaries of lay expertise. Their opinions were not based on the product of applying familiar reasoning processes to their job experience -- rather, they could form their opinions only by understanding technical Medicare laws and regulations. Contrary to the Government's arguments, the fact that Stone and Ayala had knowledge of Medicare law through their occupations does not make it "personal knowledge" qualifying as lay expertise under Rule 701. As stated above, our use of the term "personal knowledge" refers, generally, to the product of a witness's process of observing patterns and drawing logical conclusions. An understanding of what Medicare law allows and forbids cannot be developed through this process. When condemning commission payments as illegal kickbacks, Stone and Ayala were not relaying their personal observations for the jury to assess; rather, they were lending the jury their knowledge of Medicare law to provide definitive commentary on the matter. Other circuits have reached similar conclusions concerning witnesses' testimony about best practices and legal regulations in fraud cases. United States v. White, 492 F.3d 380, 399-405 (6th Cir. 2007) (finding Medicare auditors could not testify about meaning of certain Medicare terms when testifying as lay witnesses); United States v. Riddle, 103 F.3d 423, 428-29 (5th Cir. 1997) (finding bank auditor needed to be qualified as expert in order to testify that

defendant's conduct fell outside of sound banking practices because witness "functioned not as a witness relaying his own observations so much as a knowledgeable bank examiner who could provide the jury with an overview of banking regulations and practices and who could authoritatively condemn [the defendant's] actions"). We thus conclude it was error to admit Stone's and Ayala's testimony that the payment of commissions to equipment coordinators violated Medicare law without qualifying them as expert witnesses.

Nonetheless, we find any error in the admission of this testimony harmless, meaning that we find it is "highly probable that the error did not contribute to the verdict." United States v. Amador-Huggins, 799 F.3d 124, 129 (1st Cir. 2015) (quoting United States v. Varoudakis, 233 F.3d 113, 125-26 (1st Cir. 2000)). Vega's theory of defense at trial was that she was not aware of the fraud or commission payments occurring at Preferred. Vega's closing argument focused on developing the theory that Acevedo, who had participated in a separate Medicare fraud scheme prior to Preferred, was the ringleader of the entire scheme. Vega did not contest at trial that Preferred paid commissions to its equipment coordinators or that such actions were illegal. Instead, the crux of her argument was that Acevedo made the payments herself or had Pérez (whom Acevedo knew prior to working at Preferred) prepare

checks for Vega, who then signed the checks without knowing their purpose. Given Vega's trial strategy, we think it is highly probable that Stone's and Ayala's statements that commission payments violated § 1320a-7b(b)(1)(B) did not contribute to the verdict. The issue that Vega posed to the jury was whether it believed Vega was knowingly involved with Preferred's commissions, not whether Preferred's scheme violated the law. Finding no reversible error, we move to another of Vega's claims.

## IV. Jury Instructions

Vega next argues that the district court's jury instructions regarding charges for aiding and abetting the receipt of kickbacks were incomplete. We reject these claims as well.

## A. The Anti-Kickback Instruction

The Government charged Vega with violating the anti-kickback statute pursuant to 42 U.S.C. § 1320a-7b(b)(1)(B). That statute makes it a crime to

> knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(1)(B). The district court instructed the jury that § 1320a-7b(b)(1)(B) "makes it a crime to . . . ask for

-18-

or receive or pay or offer to pay any remuneration in connection with referring patients or arranging for which [sic] payments may be made under the federal healthcare program."  It went on to state that in order to convict Vega

> [T]he government must prove each of the following beyond a reasonable doubt:
>
> One, referring an individual to a person for the furnishing or arranging for the furnishing of an item or service that could be paid for, in whole or in part, by a federal healthcare program.  Or, two, purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item that could be paid for, in whole or in part, by a federal healthcare program.  And, third, that Ms. Vega did [so] knowingly and willfully.

Vega argues for the first time on appeal that these instructions were incomplete because they did not state that the jury needed to find that Vega aided or abetted in the "solicit[ation] or recei[pt] [of] any remuneration" and did not define "remuneration."  When a defendant makes no objection to a jury instruction at trial, this court reviews the instruction for plain error.  United States v. Meadows, 571 F.3d 131, 145 (1st Cir. 2009).  In order to establish plain error, "a criminal defendant must show (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. González-Vélez, 466 F.3d 27, 34-35 (1st Cir. 2006)

-19-

(quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). "[T]he plain error hurdle . . . nowhere looms larger than in the context of alleged instructional errors." United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001).

The district court's instructions in this case do not clear this hurdle. While the district court's instruction may not have been "letter perfect," we think that, "read[] against the backdrop of the charge as a whole," the district court's instruction was sufficient. Id. at 246-47. The district court mentioned that Vega needed to aid or abet in the receipt of remunerations before describing the elements the Government needed to prove. We think that this was sufficient for the jury to understand that the charge also required evidence of a remuneration and, thus, that absent a contemporaneous objection, it did not constitute plain error.

We also think the backdrop of the charge as a whole did not necessitate a definition of the term "remuneration." The Government's charges were not based on a novel conception of the word "remuneration." They were in reference to Preferred paying Garrastegui and its equipment coordinators according to the amount of DME they prescribed and ordered. The term "remuneration" referred to these payments. Given this straightforward use of the

term, we do not think it was plain error for the district court to leave it undefined.

## B. Safe Harbor Instruction

Vega has one preserved jury instruction claim. While discussing the jury instructions with the district court, Vega requested that the court instruct the jury about the "safe harbor" provisions promulgated by the Department of Health and Human Services. The district court denied this request. When "a criminal defendant seasonably requests an instruction on a particular theory of the case and the trial court flatly refuses to submit that theory to the jury, our review is plenary." United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007).

The Department of Health and Human Services has promulgated regulations stating that certain payments are not "remunerations" in violation of § 1320a-7b(b)(1)(B). Vega claims she should have been allowed to argue to the jury that Preferred's payments to its equipment coordinators fit within the safe harbor described in 42 C.F.R. § 1001.952(d). This regulation allows principals, such as DME suppliers, to pay agents, such as equipment coordinators, for their services if several provisions are met, including: that the payment agreement is in writing, the contractual relationship is for more than one year, and the agent's payment is at a set salary. Id. § 1001.952(d)(2), (4), (5).

"[T]o warrant a jury instruction on a specific theory of defense, the evidence adduced at trial, taken in the light most flattering to the accused, must plausibly support the theory." Ramos-Paulino, 488 F.3d at 461 (emphasis in original). "The burden is on the defendant, as the proponent of the theory, to identify evidence adduced during the trial that suffices to satisfy this standard." Id. at 462.

Vega has not pointed us to any evidence showing that the safe harbor provisions could have plausibly applied to her case. Simply put, Vega did not even argue that Preferred met the basic requirement that its payment agreements with its equipment coordinators were in writing -- let alone that these agreements were for a period longer than one year and had a set salary. On this final point, Vega did not argue to the jury that Preferred paid its equipment coordinators salaries. As discussed in the previous section, Vega's theory of defense was that she had no knowledge of the commissions. Given this trial record, we find no error with the district court's denial of Vega's request for a safe harbor instruction.

## V. Identity Theft

Vega also raises two sufficiency challenges on appeal. The first challenge regards her convictions for identity theft for using the personal information of Medicare beneficiaries Figueroa,

Quiles, and Toro to order equipment and submit claims to Medicare without their permission. A person commits aggravated identity theft when that person "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person" "during and in relation to any felony violation enumerated in subsection (c)," which includes any fraud crime enumerated in chapter 18 of the U.S. Code. 18 U.S.C. § 1028A(a)(1),(c)(4).

Vega contests this final fraud element. She notes that, as charged in the indictment, she used the beneficiaries' identities some time prior to December 2010.[10] The timing, Vega argues, is significant because in that month she (according to Garrastegui's testimony) asked Garrastegui to visit Preferred's office and fill out medical documentation that was missing from Preferred's medical claim files.[11] Vega acknowledges that a reasonable jury could conclude she knew of Preferred's fraud based on this testimony, but argues this was the only evidence proffered sufficient to prove her guilt. If true, tying these threads

---

[10] The specific dates are: May 7, 2010 (Quiles); August 17, 2010 (Toro); and September 21, 2010 (Figueroa).

[11] Garrastegui did not testify that he came to Preferred in December 2010 -- he could remember only that he visited in "the latter part of 2010." The December 2010 date appears to come from the testimony of an auditor Vega hired. This auditor testified that when he visited Preferred in early December 2010, many of the claims he saw lacked required medical documentation.

together would mean that Vega did not know Preferred's claims were fraudulent prior to December 2010 and thus, could not have used the beneficiaries' personal information in connection with fraud as required by the identity theft statute.

We, however, reject Vega's premise that Garrastegui's visit to Preferred was the only evidence proving her knowledge of Preferred's fraud. When reviewing a sufficiency of the evidence claim, we must "take the evidence and draw all reasonable inferences in the light most favorable to the prosecution." United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010). "If a reasonable jury could find the defendants guilty beyond a reasonable doubt of all elements of the charged offense, we must affirm the conviction." Id.[12]

A reasonable jury could conclude that Vega knew of the fraud occurring at Preferred prior to Garrastegui's visit. The

---

[12]  Moreover, Vega did not argue that the Government presented insufficient evidence for the charges prior to December before the district court. Vega's Rule 29 motions for acquittal argued only that the Government failed to prove her awareness of Preferred's fraud at any point during the conspiracy. As "a party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court," we review for plain error. Acosta-Colón, 741 F.3d at 210 (quoting United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992)); see also United States v. Christi, 682 F.3d 138, 140 (1st Cir. 2012) (applying plain error to sufficiency theory not articulated in Rule 29 motion). Nonetheless, we would reject Vega's claim even if it was preserved and our discussion treats it as such.

Government presented several strands of circumstantial evidence through which a reasonable jury could infer knowledge, and a "jury [is] entitled to rely on plausible inferences." United States v. Matthews, 498 F.3d 25, 31 (1st Cir. 2007).

First, a reasonable jury could infer that Vega knew the claims Preferred submitted on behalf of Figueroa, Quiles, and Toro were fraudulent at the time of submission or soon thereafter. Each of the beneficiaries (or a spouse or a relative) testified that he or she told Preferred the beneficiaries did not want the DME, one of whom stated she spoke with Vega directly.[13] Moreover, multiple witnesses testified that Vega had a large degree of control over Preferred's operations. Vega told an FBI agent investigating her that nothing at Preferred was done without her consent. Additionally, as described by Acevedo, the DME orders and Medicare claims did not go exclusively through the equipment

_____

[13] Quiles testified that he called Preferred asking someone to pick up the DME, but his request was ignored. Yet Preferred billed Medicare for equipment it claimed it rented to Quiles from at least March 2010 to March 2011. Toro's daughter testified that two people from Preferred came to their house after her father called their office saying he did not want the DME delivered. Preferred, however, did not pick up the equipment and billed Medicare in Toro's name from March 2010 through March 2011 and claimed he was seen by Garrastegui. Figueroa's wife, Pascasia, testified that she told someone who identified herself as Vega over the phone that Figueroa did not need the equipment "[b]ecause the physician who came over [and prescribed it] [was] not [her] husband's attending physician." Preferred picked up the equipment but continued billing Medicare from August 2010 through October 2010.

coordinators. Rather, once an equipment coordinator obtained a patient's information, either Vega or her secretary would verify that the patient was a Medicare beneficiary. Given Vega's role at Preferred, a jury could rationally find that Vega must have known that the beneficiaries complained to Preferred they did not want DME delivered to their houses and therefore any claims filed after their complaints were fraudulent.

Second, the testimony of Preferred's equipment coordinators suggested that Vega not only knew of the fraud, but actively played a role in directing it. Acevedo testified that at Vega's instruction, Preferred did not fulfill DME orders that came from individuals who were not Medicare beneficiaries or that did not contain a motorized wheelchair (a high-priced item). A reasonable jury could infer that Vega was interested in fulfilling orders only from Medicare beneficiaries because Medicare's honor system made it easy to defraud. Similarly, Vega's insistence on orders containing a motorized wheelchair creates a strong inference that she did not care about whether the DME orders fulfilled served a legitimate medical purpose. Vega's indifference towards the medical legitimacy of Preferred's orders is further bolstered by Acevedo's testifying that she told Vega when she started working at Preferred (i.e., March 2010) that Garrastegui would prescribe DME for patients he did not see.

-26-

Sárraga also testified that he knew Vega was aware of this fact. The fact that Vega allowed equipment coordinators to submit claims with Garrastegui as the prescribing doctor also supports an inference that she condoned Preferred's fraud.

We also note that a reasonable jury could view Preferred's commission payments to the equipment coordinators (which Vega set and paid), taken with this record, as further evidence that Vega had a role in directing the fraud. Standing alone, this would not be sufficient to prove Vega knew of the fraud, but it is further evidence that Vega was motivated to submit as many claims as possible to Medicare, regardless of their legitimacy.

All of this evidence combined convinces us that a reasonable jury could conclude Vega had knowledge of Preferred's fraud beyond a reasonable doubt. We therefore reject Vega's sufficiency challenge.

## VI.  Money Laundering

In addition, Vega contests the sufficiency of the Government's evidence proving her involvement with money laundering. In order to commit money laundering, a defendant must "engage in a monetary transaction in criminally derived property of a value greater than $10,000" that is in or affects interstate or foreign commerce. 18 U.S.C. § 1957(a), (f)(1). The Government

charged Vega with money laundering based on her using money in Preferred's bank account to make two transactions: to pay off an $16,302.65 automobile loan in late December 2010 and to purchase an official check in the amount of $34,121.16 in January 2011. Vega contests the sufficiency of the Government's evidence regarding several elements of this crime.

First, Vega argues that the Government did not present sufficient evidence proving that she knew the property she transacted in -- i.e., the money she used to pay her loan and purchase a certified check -- was criminally derived. This argument hinges on the point we rejected in considering her identity theft claim -- that the Government did not provide sufficient evidence to prove she knew of the theft at Preferred prior to December 2010. We also note that Vega's money laundering charges correspond to transactions that occurred after the date she concedes the Government proved she knew of the fraud (late December 2010 and mid-January 2011).

Second, Vega argues that the Government failed to prove that the value of each transaction was greater than $10,000. This argument is also contingent on Vega's view that the Government did not prove she knew of Preferred's fraud until December 2010. According to Vega, Medicare paid only $9,633.98 to Preferred following December 2010 and we should assume Vega used only "clean"

funds to pay her loans.  Our finding that the Government presented sufficient evidence that Vega knew of the fraud prior to December 2010 compels us to reject her argument.

Finally, Vega argues that the Government failed to prove that her transactions affected interstate commerce.  Vega points to the fact that Preferred's bank account was with Banco Popular and both of her transactions went to other Banco Popular accounts. She argues that transferring money within the same bank cannot affect interstate commerce.  This claim was considered sua sponte by the district court and then rejected based on the Government's arguments that a witness who worked for CIGNA, the processor that paid out Medicare claims, stated CIGNA was located in Tennessee and was the subsidiary of a South Carolina company.  Vega now argues this ruling was erroneous because there was no testimony that CIGNA was based in Tennessee and the location of CIGNA's parent company was irrelevant.

We reject Vega's argument.  Section 1957 requires only a de minimus effect on interstate commerce.  United States v. Benjamin, 252 F.3d 1, 10 (1st Cir. 2001).  We have previously stated that a bank deposit affects interstate commerce if "the source of that deposit actually affected interstate commerce to any degree."  Id. at 11.  The crux of the Government's cases against Vega was that she defrauded a federal health care program.

We think it is uncontroversial to conclude the source of Vega's funds affected interstate commerce, thereby satisfying the interstate commerce element.  See United States v. Girod, 646 F.3d 304, 315 (5th Cir. 2011) (rejecting defendant's argument government failed to prove interstate commerce affect for healthcare fraud charges because "Medicaid . . . is a federally funded program that indisputably affects interstate commerce"). We thus find the Government presented sufficient evidence to convict Vega of money laundering.

## VII.  Conclusion

Finding that the Government presented sufficient evidence and any procedural defects were harmless, we affirm.

**Affirmed**.