DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ANDREW WILLIAMS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-1504

[July 15, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn D. Kelley, Judge; L.T. Case No. 502018CF005193A.

Carey Haughwout, Public Defender, and Claire V. Madill, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Rachael Kaiman, Assistant Attorney General, West Palm Beach, for appellee.

PER CURIAM.

The defendant appeals his conviction and sentence for attempted first-degree murder of a liquor store clerk. He argues the trial court erred in: (1) admitting testimony regarding the shooter's height as compared to the defendant; (2) overruling an objection to the prosecutors' use of demonstrative aids; and (3) preventing the introduction of the victim's sworn statement. He also argues the information was fundamentally defective. We agree with him on issues one and two and reverse for a new trial.

In 2018, law enforcement received a crime stoppers tip naming the defendant as the shooter at a liquor store incident in 2016. The State charged the defendant with attempted first-degree murder with a firearm (premeditated).

At trial, the victim testified he was working at the liquor store on the day of the incident. The defendant came into the store and wanted to buy

a half pint of liquor. The victim asked the defendant for identification because he looked young. The defendant began to argue with the victim and said he knew the owner. The victim told him he still needed the identification.

The victim testified the defendant left and returned with his ID.

> [He] came back in, was still being rude and disrespectful, cussing at me and stuff. And then while I was checking his ID, it--it [sic] says his legal age and stuff. It looked legit and everything. But he was still being rude. And then he said remember my face, you p___y a__ bitch.

(omissions added). The victim refused the defendant service and told him to "get the hell out of the store." The defendant left between 4:00 and 6:00 p.m.

Later that evening, the victim heard the bell attached to the front door, indicating a customer was entering. A new clerk the victim was training assisted the customer, and the customer left. The victim heard the bell go off a second time. When he looked up, he saw an individual walk into the store with his hands in his jacket and some "skully-type thing on [his] head. And some glasses." The lenses of the glasses were black.

He estimated the individual's height was between five-five and five-ten. He explained that where he stood near the cash register was elevated from the customer by about six inches. He described the individual as "light-skinned African-American or black person" who had twists or dreadlocks with a couple little gold clamps on some strands of hair. He could see only the nose, mouth, lips, and chin of the individual due to the glasses and hoodie.

> [Victim]: So I was still counting. And I looked up because I seen somebody in front of me. Whenever I looked up, that's whenever I seen the gun. I yelled gun, bang, bang -- then I started back stepping in towards the office. . . . And I must have -- well, I basically back stepped left into the supply room area.
>
> [State]: Were you hit?
>
> [Victim]: Yeah, I was shot twice.

2

[State]: Okay. Did you recognize the person that you shot that shot you that evening?

[Victim]: Yes.

[State]: Was it the same person that you had an argument with earlier the day before?

[Victim]: Yes.

The victim then identified the defendant as the shooter and the customer who argued with him earlier.

At the hospital, the victim gave a sworn statement to the police. He remembered telling officers the shooter had a tattoo, but not where it was located. He did not remember telling the officers he was only about fifty percent sure the shooter was the same person he had argued with earlier.

The defendant attempted to impeach the victim with his prior sworn statement, but the court advised that if the victim did not recall, the statement could only be used to refresh his recollection, not impeach him. After listening to his prior sworn statement, the victim stated that he told the officer he was above fifty percent sure the defendant was the shooter. The defendant asked the victim again, but the State objected to the question as improper impeachment. The trial court sustained the objection.

The defendant requested to play the last portion of the victim's sworn statement to the jury. Once again, the State objected, and the court sustained the objection. The victim confirmed he was above fifty percent sure.

In May 2018, the police presented a photo lineup to the victim. He identified photo #2, the defendant, as the shooter. Prior to viewing the lineup, the victim had not seen the surveillance video in over a year. He based his lineup identification on his own recollection.

Another store employee working that night remembered preparing to close when a man came in and shot the victim. The man wore glasses, a hooded sweatshirt, and pants. He believed the man was about five-eleven. The shooter did not say or ask for anything. He just came in and shot the victim.

3

The detective assigned to investigate the shooting arrived on scene and conducted a walkthrough. He noted interior surveillance cameras inside the store. He was able to obtain video surveillance footage from the store for the time period the defendant was in the store earlier in the day, as well as footage when the shooting occurred. Regarding the surveillance footage showing the shooting, the State questioned the detective about whether he could estimate the shooter's height. The detective testified it is usual for stores to have height markers near entrances. In this instance, there was no height marker; however, there was a prominent black line on signage attached to the large glass window adjoining the front door. The detective used the black line as a height marker and had multiple still shots from the surveillance videos enlarged. He further testified:

> [State]: Okay. Now, going back to the markers that you mentioned, were you able, once watching the video, to then go back to certain physical markers and compare that to—to be able to make an estimation of the suspect or the shooter's potential height?
>
> [Detective]: Yes.
>
> [State]: And explain how you did that.
>
> [Detective]: Well, when the subject entered the store, based on how the door -- based on how the door is fixated, just to -- if you're exiting the store -- say I'm exiting the store, just to the right of the glass door there was a -- there was a sign there. And the sign had like a black line that you can clearly see. So I used that to gauge the height by measuring from that line down. And by comparing that to the assailant when he's walking in and out.
>
> [State]: Okay. And using that estimation, approximately what height were you able to determine for the perpetrator of this crime?

Defense counsel objected to this testimony based on a lack of foundation for the detective to testify as an expert. He also objected on the ground that the detective's testimony invaded the province of the jury. The trial court overruled the objections, stating:

> Well, I'm not sure he put a science behind it. What he's testifying to, his investigative process with respect to, for his own purposes, obtaining an estimate of a height. He's not

4

giving an expert opinion as to what the height was, he's just saying pursuant to my investigation this is what I did to come up with a potential height of the perpetrator.

. . .

I'm just saying, I don't think he's giving an expert opinion. I think what he's doing is saying as part of my investigation I took these steps to get for my own investigative purposes an approximate height of the perpetrator. I think he can do that.

The detective subsequently testified that he was able to come up with the assailant's approximate height by measuring the black line on the sign the assailant passed coming into the store and noting from the enlarged still photos from the surveillance video that the top of the assailant's head appeared to be the same height as the black line. Regarding the shooter's approximate height, the detective testified, "I measured it at roughly sixty-nine and three-quarters to maybe seventy inches, seventy inches and a quarter," which he converted to "[f]ive-nine and three-quarters to about five-ten and a quarter," upon prompting by the State. He further testified that both the defendant and the shooter appeared to be the same height, using the same black line when comparing the two video footages. To further document his investigation, the detective placed red arrows on the photos to demonstrate the top of the head of the shooter and the defendant at the same height as the black line. The photos were admitted into evidence.

When interviewed, the defendant admitted to the altercation with the victim, but denied returning to the store or shooting the victim. When the defendant signed his Miranda form, the detective saw that he used his right hand. The shooter was right-handed. The detective also measured defendant's height as five foot eleven inches when interviewed.

After the defendant became a suspect, the detective queried his name in the Driver and Vehicle Information Database ("DAVID"). He found a photo of the defendant the day after the shooting. The photo showed the defendant's hairstyle and features around the time of the shooting. It listed the defendant's height as five foot eleven.

During the closing argument, the prosecutor argued that the victim would be able to identify the shooter, even with a hoodie and glasses. She then proceeded to put on a hoodie and a pair of sunglasses to demonstrate. Defense counsel objected arguing the hoodie sweatshirt and glasses were not the same as in the pictures and went beyond a demonstrative aid. This

was more prejudicial than probative. The trial court overruled the objection and allowed the prosecutor to use the hoodie sweatshirt and glasses as a demonstrative aid, but gave the following instruction:

> All right. Ladies and gentlemen of the jury, the sweatshirt and glasses being utilized at this time by [the prosecutor] in her closing argument is not evidence. It's just a demonstrative aid to assist in presenting her argument. But it is not evidence in the case.

The prosecutor then argued:

> Okay. Obviously, we never collected the actual evidence that was used. But I do this to show you that on a piece of paper with skin color, and background images, and pixilation, it doesn't show the same effects as a pair of sunglasses and a hood over the hood [sic].

> That's what [the defendant] put on and went back into the store with. That's all that separated him from earlier in the day when he was face to face with that same man. He could see everything on the face. He said the nose, the chin, the lips, the cheekbones. He was distinct. And he told you that as sure as we're all sitting in this room, he could see that that was the same man.

The State also commented on the detective's height theory. "The height, we know that's [the defendant], and we now know where his height was in proportion to the door. And we know he is the same height in proportion to the same spot as the shooter himself later in the day."

During deliberations, the jury submitted two questions to the trial court:

> 1. How sure arrow height parallel to ground and same height day and night?

> 2. When did the victim say shooter had neck tattoo, hospital or at liquor?

The court explained that it could not respond because both questions were factual. The court told the jury to rely on the evidence presented and their recollection.

6

The jury convicted the defendant as charged finding that during the offense the defendant: (1) possessed a firearm; (2) discharged a firearm; (3) caused the victim great bodily harm in discharging the firearm; and (4) carried, displayed, used, threatened to or attempted to use a weapon. The defendant moved for a new trial, judgment of acquittal, and/or arrest of judgment. Defense counsel argued the trial court erred in overruling his objection to the prosecutor wearing a sweatshirt and sunglasses in closing. The trial court denied the motion, but stated:

> Candidly, I had some concerns about the hat and glasses, but I based on the instruction I gave, I do not believe that's reversible error, nor do I believe it would require a new trial. So I'm going to deny the motion for new trial at this time.

The trial court sentenced the defendant to a thirty-five year minimum mandatory. The defendant now appeals.

- ***The State's Demonstrative Evidence***

The defendant argues the trial court erred in overruling his objection to the prosecutor wearing a dissimilar pair of sunglasses and sweatshirt during closing to bolster the reliability of the victim's identification. The State responds there was no error in the prosecutor's use of the demonstrative aid. We agree with the defendant.

We review the use of a demonstrative aid at trial for an abuse of discretion. *Lowe v. State*, 259 So. 3d 23, 39 (Fla. 2018), *cert. denied sub nom., Lowe v. Florida*, 139 S. Ct. 2717 (2019).

We have explained:

> Demonstrative evidence is admissible only when it is relevant to the issues in the case. . . . [I]t is essential, in every case where demonstrative evidence is offered, that the object or thing offered for the jury to see be first shown to be the object in issue **and that it is in substantially the same condition as at the pertinent time, or that it is such a reasonably exact reproduction or replica of the object involved that when viewed by the jury it causes them to see substantially the same object as the original**.

*Walker v. State*, 82 So. 3d 115, 117 (Fla. 4th DCA 2011) (alteration in original; emphasis added) (quoting *Chamberlain v. State*, 881 So. 2d 1087, 1102 (Fla. 2004)).

7

The State argued in closing:

> But [the victim] told you they were the same person. And he was there. And so when we start looking at videos, and we start taking clips and screen shots, and print them out on paper, and pass them around to you as the jury, keep in mind that that is not the same effect as being in person and face to face with an individual like [the victim] was.

The prosecutor then briefly put on a pair of sunglasses and a hoodie sweatshirt to give the jury an understanding, in person and up close, of the victim's view of the shooter.

The defendant claims the prosecutor failed to prove similarity between the demonstrative sunglasses and hoodie sweatshirt and those used during the crime. The record reveals the prosecutor admitted the hoodie and sunglasses were not the same, nor similar. Prior to allowing the prosecutor to continue with its closing, the trial court instructed the jury the demonstrative aids were not evidence, and that they were not the same as those used in the crime.

Here, the sunglasses and hoodie sweatshirt were admittedly dissimilar to those worn by the shooter. They were also worn by a female prosecutor when the shooter was a male, and there is nothing in the record to show any similarity between body, facial, or hair similarities to know whether the hoodie and glasses fit the prosecutor's body frame to be substantially similar as to how they may have appeared to the victim. They therefore could not provide the jury with a relevant comparison and instead only served to mislead the jury. They did not set the circumstances of the shooting nor mimic what the victim experienced. This causes us the same concern the trial court originally had.

The trial court correctly instructed the jury in an attempt to ameliorate the harm. But it did not alleviate the prejudice created by the prosecutor's use of these dissimilar demonstrative aids. Identification was the key issue in this case. By permitting the prosecutor to use dissimilar demonstrative aids, it ran the risk of misleading the jury without providing any probative value. For this reason, we reverse and remand the case for a new trial.

- ***The Detective's "Height" Testimony***

8

The defendant next argues the trial court erred in overruling his objection to the detective's testimony about the shooter's estimated height. He contends that the detective's process of discerning the size of the objects in the photograph and/or surveillance video is a science called "photogrammetry,"[1] which requires expertise and precise methodology to be reliable. He alternatively argues, to the extent this opinion did not require expertise, the trial court erred in overruling his objection because the testimony invaded the province of the jury.

The State responds the detective's height testimony was fact-based and derived from his investigation of the crime scene and surveillance video. It was not expert testimony. It did not invade the province of the jury; and in any event, it was harmless beyond a reasonable doubt.

We agree with the defendant that the detective's testimony regarding the comparison of height between the defendant and the assailant was opinion testimony. We agree that the detective could not qualify as an expert or give expert opinion on the height based upon the photographs. It appears that the trial court admitted it as lay opinion testimony by a law enforcement officer based on his experience. We agree that the detective's testimony could not qualify as admissible lay witness opinion and was improper. We also agree that the admission of the opinion was not harmless error.

The admissibility of evidence is reviewed under an abuse of discretion standard; however, discretion is limited by the rules of evidence. *Jones v. State*, 95 So. 3d 426, 429 (Fla. 4th DCA 2012).

At trial, the detective gave his opinion that the shooter was a certain height and that the defendant and the shooter were the same height. It appears the detective arrived at his opinion of the heights of the shooter and the defendant were the same by going to the crime scene and measuring the height of the black line on a sign posted on one of the doors, watching both surveillance videos, getting still images of the shooter and the defendant from the videos and applying red arrows to them, and obtaining the height of the defendant from two sources.

---

[1] Photogrammetry is defined as "the science of making reliable measurements by the use of photographs and especially aerial photographs (as in surveying)." *Photogrammetry*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/photogrammetry (last visited Apr. 29, 2020).

The defendant contends that the detective's opinions fall in the realm of the science of photogrammetry. Citing a legal periodical article, the defendant explains in the initial brief that "proper photogrammetry requires 'some initial camera math information in order for the final output to be reliable,' along with calculations based on geometry, physics, and 'photogrammetric triangulation.'" Lee DeChant, *How Photogrammetry Expert Can Help You Win Your Case*, 14-MAY Nev. Law. 19, 19 (2006). It is clear from the testimony that the detective made no calculations. Instead, he made one measurement using a tape measure and testified to the defendant's height based upon what appears to be an extrapolation from that measurement. If the detective's opinions were the result of a calculation or extrapolation from data, we agree the detective's opinions would fall in the realm of expert testimony which he was unqualified to give.

The trial court, however, did not view the testimony as expert opinion. Because the trial court overruled the objection that the testimony invaded the province of the jury, we address the issue of whether the detective's testimony supports his height opinions as admissible lay witness opinion.

"Generally, a lay witness may not testify in terms of an inference or opinion, because it usurps the function of the jury." *Jones v. State*, 95 So. 3d 426, 429 (Fla. 4th DCA 2012) (citing *Floyd v. State*, 569 So. 2d 1225, 1231–32 (Fla. 1990)). However, section 90.701, Florida Statutes (2019), provides an exception to the general rule.

> If a witness is not testifying as an expert, the witness's testimony about what he or she perceived may be in the form of inference and opinion when:
>
> (1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
>
> (2) The opinions and inferences do not require a special knowledge, skill, experience, or training.

§ 90.701, Fla. Stat. (2019).

The first sentence of section 90.701 makes clear that "[o]pinion testimony of a lay witness is only permitted if it is based on what the

witness has personally perceived."  *Id.*; *Alvarez v. State*, 147 So. 3d 537, 542 (Fla. 1st DCA 2014) (quoting *Fino v. Nodine*, 646 So. 2d 746, 748 (Fla. 4th DCA 1994)).  Moreover, "the lay witness's testimony must be grounded in reliability and personal perception rather than speculation."  *Lewek v. State*, 702 So. 2d 527, 532 (Fla. 4th DCA 1997).  The statute has been interpreted to mean that "[l]ay witness opinion testimony is admissible if it is within the ken of an intelligent person with a degree of experience."  *Floyd*, 569 So. 2d at 1232 (citing *Peacock v. State*, 160 So. 2d 541, 542–43 (Fla. 1st DCA 1964)).

Section 90.701 establishes two predicates for the admission of lay witness opinion:  (1) the opinion or inference is needed because the witness cannot "with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact," provided that "the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party;" and (2) "[t]he opinions and inferences do not require a special knowledge, skill, experience, or training."  § 90.701(1), (2), Fla. Stat.

We have addressed the testimony of law enforcement witnesses offering lay opinions based on their review of surveillance videos in two relatively recent cases.  In *Alvarez*, we addressed whether a law enforcement officer may offer his opinion of the skin color and race of the perpetrators depicted on a video admitted into evidence.  147 So. 3d at 542.  There, we noted that "[e]ven non-eyewitnesses may testify as to the identification of persons depicted or heard on a recording so long as it is clear the witness is in a better position than the jurors to make those determinations."  *Id.*  Quoting *Ruffin v. State*, 549 So. 2d 250 (Fla. 5th DCA 1989), and relying our opinion in *Charles v. State*, 79 So. 3d 233 (Fla. 4th DCA 2012), we said:  "However, '[w]hen factual determinations are within the realm of an ordinary juror's knowledge and experience, such determinations and the conclusions to be drawn therefrom must be made by the jury.'"  *Id.* (quoting *Ruffin*, 549 So. 2d at 251).  Because there was no record evidence to indicate that the detective was in a better position than the jurors to view the surveillance video and enlarged stills to determine the skin color and races of the perpetrators, we concluded the admission of the officer's opinion was error and reversed for a new trial.  *Id.* at 543, 544.

In *Charles*, we reversed after concluding the trial court erred in admitting a detective's opinion that the person shown in a surveillance video at the time of the crime was the defendant.  79 So. 3d at 234. Because the detective was not an eyewitness to the crime, had no special familiarity with the defendant, and was not otherwise qualified as an expert in video identification, we concluded that the detective's opinion

11

invaded the province of the jury to draw its own conclusion about whether the defendant was the person depicted in the video. *Id.* at 235.

Our supreme court has stated that to the extent the Florida Evidence Code is patterned after the Federal Evidence Code, "we should construe the former in accordance with federal court decisions interpreting the latter." *Moore v. State*, 452 So. 2d 559, 562 (Fla. 1984); *see, e.g., Hightower v. Bigoney*, 156 So. 2d 501 (Fla. 1963); *Bank of N.Y. v. Calloway*, 157 So. 3d 1064, 1071 n.3 (Fla. 4th DCA 2015) ("Where, as here, a Florida evidentiary rule is patterned after its federal counterpart, 'federal cases interpreting comparable provisions are persuasive and routinely looked to for interpretive guidance.'"). In *Johnson v. State*, 254 So. 3d 617 (Fla. 1st DCA 2018), the First District recently relied on federal precedent as persuasive authority on the admission of lay opinion related to law enforcement experience. There, the issue was an officer's opinion about the capability of a law enforcement canine. *Id.* at 619. The First District relied in part on the case of *United States v. Spencer*, 873 F.3d 1, 14-15 (1st Cir. 2017), where the First Circuit wrote:

> We have explained further that the touchstone for the admissibility under Rule 701 of such lay-opinion testimony is whether the testimony has the "potential to help the jury." *United States v. Albertelli*, 687 F.3d 439, 447 (1st Cir. 2012).
>
> Under this standard, we have deemed testimony inadmissible "when the jury can *readily* draw the necessary inferences and conclusions without the aid of the opinion." *United States v. Etienne*, 772 F.3d 907, 919 (1st Cir. 2014) (emphasis in original) (citations omitted). We have also explained that helpful testimony is typically "**based on the lay expertise a witness personally acquires through experience, often on the job**." *United States v. Vega*, 813 F.3d 386, 394 (1st Cir. 2016) (quoting *United States v. Maher*, 454 F.3d 13, 24 (1st Cir. 2006) ); *see also United States v. Ayala–Pizarro*, 407 F.3d 25, 28–29 (1st Cir. 2005). And, we have noted that "**a police officer noticing patterns of behavior across criminal operations uses straightforward logic to conclude a defendant's behavior fits within that pattern and thus, does not need to be qualified as an expert**." *Vega*, 813 F.3d at 394.

254 So. 3d at 622. (emphases added).

In the instant case, the detective properly testified that he observed the two video footages and noticed that the defendant and the shooter passed by the same black line on the window near the entrance door. He properly testified that he measured the height of the black line from the floor, but he never directly testified what the measurement was. He also properly testified about his reasons for blowing up still images from the video footages as part of his investigation. However, his opinions of his perceptions that the shooter was five feet ten inches tall and that the photos show that the defendant and the shooter were the same height were not based on being an eyewitness, having prior knowledge of the defendant, or using some knowledge or skill developed from on the job training. Without being an eyewitness, having prior knowledge of the defendant, or having some practical on the job experience that a juror may not be familiar with, the detective was in no better position to estimate or compare heights from the photographs than the jury. Putting the arrows on the still photos did not cloak the opinions with admissibility as lay opinions and was misleading because there was no evidence as to the distances between the defendant, the shooter, and the black line at the time the images were captured. In other words, there were factors needed to extrapolate from the blown-up images to correctly estimate height measurements. The detective did not have the training or experience to testify about those factors. It is significant that the arrows were not helpful because the jury asked the question during deliberations: "How sure arrow height parallel to ground and same height day and night?" Thus, we conclude the detective's opinions invaded the province of the jury and were misleading. The trial court erred in admitting the detective's lay opinions regarding height.

Similar to *Alvarez* and *Charles*, we conclude the error was not harmless. As we said in *Charles*, "'error in admitting improper testimony may be exacerbated where the testimony comes from a police officer.' There is the danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial." 79 So. 3d 235. The State relied on the detective's opinions in closing argument, and again, a question by the jury demonstrates it considered the detective's lay opinions.

Having concluded that the trial court erred in allowing the prosecutor to use dissimilar demonstrative aids during closing argument and admitting improper lay opinions by the lead detective, we reverse and remand the case for a new trial.

*Reversed and remanded for a new trial.*

WARNER and CONNER, JJ., concur.
MAY, J., concurs in part and dissents in part with opinion.

MAY, J., concurring in part and dissenting in part.

I agree with the majority's decision to reverse and remand for a new trial based on the prosecutor's improper use of dissimilar demonstrative aids. I disagree however that the detective's testimony did not qualify as permissible lay opinion evidence and that it invaded the province of the jury. I would affirm on this issue.

Here, the detective personally reviewed the surveillance videos and observed the defendant and shooter enter the crime scene through the same door. In doing so, they both passed by a sign near the door that contained a distinct black line at the top. The detective then went to the crime scene and measured the height of the black line from the floor. He compared the height of this black line to still shots of the defendant and the shooter. He opined their height was the same. He also verified the defendant's height from the DAVID printout.

The detective's testimony fell within the permissible bounds of section 90.701, Florida Statutes (2019). Indeed, the majority agrees the detective could testify about: his observation of the two videos; that the defendant and shooter passed by the same black line near the entrance door; the exact measurement of the distance between the black line and the floor; and why he blew up the still images. But the majority stops short of permitting the detective's height testimony and holds the detective could not estimate the shooter and defendant's height were the same and were approximately five feet ten inches.

Under section 90.701, a witness may testify by giving an opinion if:

> (1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and

> (2) The opinions and inferences do not require a special knowledge, skill, experience, or training.

§ 90.701, Fla. Stat. (2019).

14

While the jurors may have been able to view the same video footage and still photos, they couldn't tell the defendant's height without the detective's testimony concerning his measurement, and his confirmation of the defendant's height from the DAVID printout.[2]  The detective's testimony simply drew an inference or opinion based on his review of the video, the stills, and the measurement he took at the crime scene.  And as the majority points out, it took no "special knowledge, skill, experience, or training" for him to do so.  In my view, the detective's testimony qualified as permissible lay witness opinion testimony under section 90.701.

Even if this testimony was considered error, any error was harmless. *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).  The evidence linked the defendant to the crime.  The victim identified the defendant as the shooter even though not 100% sure when the detective interviewed him at the hospital.  He chose the defendant's photo in a lineup.  The victim testified he could see the shooter's skin color, nose, chin, lips, and cheekbones and they matched the defendant.

The surveillance video of the defendant entering the crime scene earlier in the day and later that night wearing a hoodie sweatshirt and sunglasses were played for the jury.  The side by side still view photos of both surveillance videos showed the defendant and the shooter were about the same height.  The victim and the other store employee testified that the shooter was about the defendant's height, which was five-eleven.  And, the detective confirmed the defendant's height on the DAVID printout.  This evidence removed any reasonable possibility that the defendant's conviction resulted from the challenged testimony.  On this issue, I would affirm.

*          *          *

**Not final until disposition of timely filed motion for rehearing.**

---

[2] The defendant also argues that "there are a number of problems with the arrows drawn by" the detective.  But, the defense did not object to the admission of the exhibits and failed to object to the arrows on the images.  The issue is therefore unpreserved.  *Orton v. State*, 212 So. 3d 377, 378–79 (Fla. 4th DCA 2017) ("Appellate review is . . . limited to the specific grounds for objection raised at trial.").