# United States Court of Appeals
## For the First Circuit

---

Nos. 24-1069, 24-1438

UNITED STATES OF AMERICA,

Appellee,

v.

KENNETH PONTZ,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

---

Before

Gelpí, Thompson, and Rikelman,
Circuit Judges.

---

James L. Sultan, with whom Rankin & Sultan was on brief, for
appellant.

Ashley Robertson, with whom Joshua S. Levy, Acting United
States Attorney, and Mark T. Quinlivan, Assistant United States
Attorney, were on brief, for appellee.

---

March 14, 2025

---

**RIKELMAN**, <u>Circuit Judge</u>.  A jury convicted Kenneth Pontz of violating a federal embezzlement statute by misrepresenting his financial situation in order to obtain public benefits.  At trial, the government relied on Pontz's conduct over an eight-year period.  Pontz appeals, raising a question of first impression for our court: Is embezzlement under 18 U.S.C. § 641 a "continuing offense" such that the government could charge Pontz for a crime that occurred more than five years earlier, despite the five-year statute of limitations?  Pontz also challenges the district court's evidentiary rulings at trial, claiming that the court admitted testimony as lay opinion under Federal Rule of Evidence 701 even though it was based on technical knowledge that could only come in through an expert.

We join the majority of our sister circuits in concluding that § 641 embezzlement is not a continuing offense under the standard established in <u>Toussie</u> v. <u>United States</u>, 397 U.S. 112 (1970).  Congress did not explicitly make § 641 a continuing offense, and, unlike kidnapping or conspiracy, for example, embezzlement is not continuing by its "nature" because there is no renewed, daily "threat of . . . substantive evil" even after the elements of the crime are complete.  <u>Id.</u> at 122.  Thus, the government could not charge Pontz for embezzlement that took place more than five years before his indictment.  But because the parties have not addressed the appropriate remedy for the

- 2 -

statute-of-limitations error, we remand to the district court to determine that remedy in the first instance. Separately, we uphold the district court's evidentiary rulings.

## I. BACKGROUND

Because Pontz does not challenge his conviction based on the sufficiency of the evidence at trial, we recite the facts in a "balanced" manner and "objectively view[] the evidence of record." United States v. Velazquez-Fontanez, 6 F.4th 205, 212 (1st Cir. 2021) (quoting United States v. Amador-Huggins, 799 F.3d 124, 127 (1st Cir. 2015)).

### A. Relevant Facts

Pontz lived with his wife Lisa Pontz in a trailer at 370 Mill Valley Road, Lot 32, in Belchertown, Massachusetts, from 2004 until their separation in June 2020. Throughout that time, Lisa[1] received Social Security Disability Insurance (SSDI) benefits, which are payments by the Social Security Administration (SSA) to individuals with disabilities. As of 2019, she was receiving $1,107.20 per month.

In 2004, Pontz filed his own application for benefits, seeking Supplemental Security Income (SSI). SSI benefits are a different form of public benefits available to certain low-income individuals, including people with disabilities, and are based on

---

[1] We refer to Lisa by her first name to avoid any confusion.

- 3 -

the applicant's need, in light of their other available financial resources. See 42 U.S.C. § 1382; 20 C.F.R. §§ 416.202, .1100. The calculation of SSI benefits depends on multiple variables, including whether the applicant lives alone (under the assumption that any adult living with the applicant is in part responsible for household income). See 20 C.F.R. §§ 416.1130-1148, .1160-1166a. The SSA generally relies on a beneficiary to report their eligibility information truthfully and accurately. Further, an applicant has a continuing obligation to report any change that might affect their eligibility and benefit amount. See id. § 416.708.

To determine Pontz's eligibility for SSI benefits in 2004, an SSA employee interviewed Pontz in person and asked about his living arrangements. Pontz stated that he lived alone at Lot 32 of 370 Mill Valley Road. Soon after his interview, the SSA approved Pontz's application, and he began receiving $340.39 each month. The notice of award explained that Pontz's benefits were based on the fact that he was "living independently f[rom] November 2004 on." It also stated that he was "required to report any change in [his] situation that may affect [his] SSI," including whether "anyone else move[d] . . . into [his] household," as it could impact his eligibility and benefit amount. With the notice, Pontz received an SSI informational booklet making clear that SSI recipients "should report a change as soon as it happens,"

including "if there is a change in the number of people who live with you."  And in the decade that followed, Pontz received yearly letters from the SSA that increased his benefit amount due to cost-of-living adjustments ("COLA letters") and reminded him of his reporting obligation.

By August 2014, it was time for an SSA eligibility redetermination.  An SSA employee interviewed Pontz over the phone. Pontz stated that he was married but that he had lived alone in Warwick, Massachusetts, from 2009 to 2014, and then at Lot 34 (rather than Lot 32) of 370 Mill Valley Road beginning in 2014. He also explained that he paid $710 per month in rent for his Mill Valley Road residence and, in response to a follow-up request by the SSA, he submitted a handwritten receipt for $725 in rent for that address.  The SSA then reconfirmed Pontz's eligibility for SSI benefits of $721 each month based on that information, which he never corrected.  In the following years, Pontz continued to receive yearly COLA letters that again reminded him of his continuing obligation to timely report any changes.  As of the start of 2020, Pontz was receiving $783 in monthly SSI benefits.

In June 2020, Lisa asked the SSA to change her benefit deposit account because she no longer wanted Pontz to have access to it.  That led the SSA to review whether Pontz had ever disclosed that he lived with his wife. An SSA investigator interviewed Pontz in 2021 at his trailer at Lot 32 and asked about his living

arrangements. Pontz answered that he had been living with Lisa until June 2020 but, when confronted with his representations to the SSA, did not explain the discrepancy.

The SSA conducted another redetermination interview over the phone in February 2022. Pontz again answered that he had lived alone at Lot 34 of Mill Valley Road from June 2014 to June 2020 and that he paid $725 in rent. (He further represented that after June 2020, he lived alone at an address in Gill, Massachusetts, and at Lot 32 of Mill Valley Road, which the government does not dispute.) Pontz also stated that he and Lisa had divorced, but the decree that Pontz submitted as proof indicated that they had shared the same address at Lot 32 for years. It also turned out that Lot 34 at 370 Mill Valley Road -- where Pontz claimed he had lived alone from 2014 to 2020 -- was empty. And contrary to his claim to the SSA that he paid $725 in rent for Lot 34, Pontz had separately told the Massachusetts Probation Service officer supervising him (for an unrelated state criminal conviction) that he was paying either $150 or $250 in rent for his trailer at Lot 32.

## B. Procedural History

On June 16, 2022, Pontz was indicted for one count of theft of government money in excess of $1,000, in violation of 18 U.S.C. § 641, for conduct from May 2014 through June 2020. The indictment alleged that the value of money stolen was approximately

- 6 -

$63,871.  It also included a forfeiture allegation for the same amount.

The date range specified in the indictment, "[f]rom in or about May 2014 through in or about June 2020," stretched beyond the five-year statute of limitations for noncapital federal crimes.  See 18 U.S.C. § 3282(a).  Pontz moved to dismiss the indictment to the extent it alleged criminal conduct before June 16, 2017.  The district court denied his motion, concluding that § 641 embezzlement was a "continuing offense" as defined in Toussie, 397 U.S. at 115, and that the government could therefore convict on a single embezzlement scheme beginning in May 2014.

The case proceeded to trial.  The government sought to prove that Pontz willfully and knowingly misled the SSA about his living situation with illicit intent.  By contrast, the defense contended that the SSA committed a clerical error in 2004 by noting that Pontz lived alone and that the error was unwittingly perpetuated until 2020.

The government called Luis Aguayo, a "claims technical expert" at the SSA, among other witnesses.  Aguayo was the SSA employee who had performed the loss calculations at the agency -- that is, the difference between what Pontz did receive in SSI benefits and what he should have received.  The district court was initially skeptical that Aguayo's testimony qualified as lay opinion.  But subject to several discrete bench rulings that

either limited or struck aspects of Aguayo's testimony, the district court permitted the government to elicit lay opinion on three topics: how the SSA determines eligibility; the meaning of codes in screenshots from Pontz's electronic file; and, very generally, how Pontz's benefits would have been impacted if he had disclosed that he was living with Lisa.

After trial, the jury returned a guilty verdict. The district court denied Pontz's post-trial motion for judgment of acquittal and sentenced Pontz to ten months, followed by three years of supervised release. It also ordered Pontz to pay $49,898 in restitution and forfeiture.[2] That sum represents the SSA's loss, or the amount of "[SSI] benefit overpayments received by Defendant between May 2014 and June 2020, the time period covered by the indictment." This timely appeal followed.

## II.  DISCUSSION

Pontz alleges two principal errors on appeal. He argues that the district court abused its discretion in admitting Aguayo's opinions, which Pontz claims could have come in only if the government had disclosed Aguayo as an expert witness and successfully qualified him as such. He also contends that the

---

[2] Prior to trial, the government filed a motion to amend the indictment to revise the loss amount from $63,871 to $49,929.80. Pontz agreed, and the district court granted the motion. At the restitution hearing, the district court determined that the $49,929.80 figure relied on a rounding error and concluded that $49,898 was the reliable loss amount.

district court erred in holding that § 641 embezzlement is a "continuing offense," as defined in Toussie, 397 U.S. at 115, and that his conviction must be reversed as a result.

We conclude that the district court's evidentiary rulings were sound, and any error, if there were one, was harmless. However, we agree with Pontz that § 641 embezzlement is not a continuing offense and that the indictment impermissibly charged him with conduct beyond the five-year statute of limitations. We therefore vacate the restitution and forfeiture orders and remand to the district court to determine whether any further relief is appropriate.

## A. Aguayo's Testimony

Pontz takes issue with several portions of Aguayo's testimony, claiming that some was inappropriate expert opinion and some was hearsay, but we conclude that none of his evidentiary arguments warrant reversal. The district court carefully considered each of Pontz's objections at trial and only admitted opinion testimony by Aguayo that was directly based on his on-the-job experience and on reasoning easily understandable to the average juror, consistent with our precedent. And any hearsay testimony by Aguayo about Lisa's benefits and disability

application was harmless because the same information came in through other evidence that Pontz does not object to on appeal.[3]

### 1. Lay Opinion Under Rule 701

Generally, the Federal Rules of Evidence permit opinion testimony only by experts under Rule 702. But, under Rule 701, a layperson can offer an opinion if it is "rationally based on the witness's perception," helpful and relevant, and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Pontz argues that Aguayo's testimony was based on specialized knowledge of SSA procedures and, therefore, should have been excluded unless the government qualified him as an expert and followed the rules for expert witnesses. See United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006) (explaining that testimony admitted under Rule 702 must be disclosed to the defense before trial, see Fed. R. Crim. P. 16(a)(1)(G), and must satisfy the heightened reliability criteria of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)). We review the admission of lay opinion under Rule 701

---

[3] The government also argues that several of Pontz's evidentiary arguments are not preserved for appeal because they were not included in contemporaneous objections during Aguayo's testimony, which Pontz disputes. But we do not need to resolve this disagreement because we find no error in the district court's ruling to admit Aguayo's testimony, and thus we would reach the same decision even under the plain error standard. We also find all of Pontz's appellate arguments to be sufficiently developed, despite the government's contention to the contrary.

for "abuse of discretion." United States v. Montijo-Maysonet, 974 F.3d 34, 47 (1st Cir. 2020).[4]

We disagree with Pontz that the district court's evidentiary rulings ran afoul of Rule 701. Some of the testimony by Aguayo that Pontz challenges was not opinion testimony at all, and the one opinion he does identify falls within the boundaries of Rule 701.

Importantly, Rule 701 does not categorically prohibit opinion testimony based on work experience. To the contrary, the rule is "meant to admit testimony based on the lay expertise a witness personally acquires through experience, often on the job." Maher, 454 F.3d at 24. Such lay opinion, however, must "refer[] to those processes that are well founded on personal knowledge and susceptible to cross-examination." United States v. Vega, 813 F.3d 386, 394 (1st Cir. 2016) (quotation marks and citations omitted). Thus, lay opinion, even if informed by job experience,

---

[4] Our court has framed the standard of review for Rule 701 rulings as "manifest abuse of discretion," United States v. Santiago, 62 F.4th 639, 649 (1st Cir. 2023), "clear abuse of discretion," United States v. Tom, 330 F.3d 83, 94 (1st Cir. 2003) (quotation marks and citation omitted), or simply "abuse of discretion," Montijo-Maysonet, 974 F.3d at 47. We do not interpret these cases as articulating different substantive standards of review. See United States v. Moon, 802 F.3d 135, 147 (1st Cir. 2015) (applying "abuse of discretion" but citing to cases applying manifest abuse of discretion). Instead, our cases merely rely on different language to reiterate that the district court has "considerable discretion" in admitting lay opinion testimony under Rule 701. United States v. Valdivia, 680 F.3d 33, 51 (1st Cir. 2012).

must be "the product of reasoning processes familiar to the average person in everyday life." Id. (quoting United States v. García, 413 F.3d 210, 215 (2d Cir. 2005)); cf. also United States v. O'Donovan, 126 F.4th 17, 37 (1st Cir. 2025) (holding that FBI examiner's testimony that iMessages are transmitted over the internet, despite being informed by FBI training, was not admissible under Rule 701 because it was not grounded "in the examiner's own perception or experience" and "could not meaningfully be probed or tested" as "cross-examination showed").

Our cases have affirmed the admission of lay opinion in a variety of circumstances. These circumstances include when the lay opinion relies "upon logic and pattern recognition," Vega, 813 F.3d at 395; when the witness testifies as to the meaning of certain legal terms of art used commonly in an industry but "never purport[s] to tell the jury what the law mean[s]," United States v. Galatis, 849 F.3d 455, 461 (1st Cir. 2017); or when the testimony was the "product of [the witness's] requisite personal knowledge" obtained "by virtue of his position," United States v. Valdivia, 680 F.3d 33, 50-51 (1st Cir. 2012) (quotation marks and citations omitted) (cleaned up). At the same time, we have held that lay opinion that wades too far into the technical weeds does not qualify under Rule 701. In particular, we have emphasized that if the witness's "personal knowledge" could not have been "developed" through a "process of observing patterns and drawing

- 12 -

logical conclusions," then the testimony can come in only if it complies with the expert witness rule, Rule 702. <u>Vega</u>, 813 F.3d at 395; <u>see also</u> <u>United States</u> v. <u>Willner</u>, 795 F.3d 1297, 1318 (11th Cir. 2015) (finding error where a Medicare fraud investigation educator offered lay opinion as to what Medicare can and cannot cover, "how Medicare functions," and "what Medicare would do in a number of hypothetical circumstances").

We begin with Pontz's challenges to Aguayo's testimony interpreting Pontz's SSA file, as well as Aguayo's statement that the SSA conducted Pontz's 2004 interview in person. It is important to put this testimony in context. Pontz takes no issue with the district court's ruling admitting into evidence screenshots from Pontz's electronic file, which Aguayo had pulled from the SSA's computer system.[5] Those screenshots were intended to establish that Pontz had interviewed with the SSA in 2004. Aguayo then testified, over objection, that the screenshots identified Pontz as the claimant; the word "initial" meant that the screenshot concerned Pontz's initial SSI claim; "V37" and "O44" under "Office Code" meant that the claim was transferred to the examiner's office in Holyoke, Massachusetts; and "face-to-face

---

[5] The screenshots were admitted under the business records exception to hearsay. The district court held that Aguayo could serve as a "qualified witness" under Rule 803(6)(D) and testify as to their authenticity. Pontz does not challenge that ruling on appeal, so there is no dispute about the admission of the screenshots themselves.

- 13 -

with claimant" meant that Pontz's interview was conducted in person.

None of this testimony was improper opinion testimony. The screenshots largely spoke for themselves and required minimal interpretation by Aguayo. To the extent his testimony on these points even qualified as an opinion or conclusion, the jury could have easily understood that "face-to-face with claimant" referred to an in-person interview. See Vega, 813 F.3d at 395; Valdivia, 680 F.3d at 50-51. And Aguayo's testimony explaining the meaning of codes "V37" and "O44" falls under Rule 701 because it did not rely on any complex regulatory or procedural knowledge that would have gone over the jury's head. See Galatis, 849 F.3d at 461. Instead, that testimony was based on his day-to-day work with these codes, which presents a classic case of lay opinion. See United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009) (holding that investigator's lay opinion on meaning of code words and phrases was admissible because he was "involved in the investigation, listened to over 90 percent of the [call] intercepts, [and] learned voices and patterns"); United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005) (holding that officer's lay opinion about prior drug arrests was admissible because he stated that he had "investigated, patrolled, or made arrests at drug points on more than 100 occasions").

Pontz devotes most of his energy to challenging Aguayo's opinion testimony concerning the SSA's loss calculation. Again, we start with the relevant context. The government asked Aguayo how Pontz's benefit amount would have been affected if he had reported that he lived with his wife. Aguayo answered, over Pontz's objection, that this information could have affected Pontz's eligibility for benefits or the amount of his benefits. The government then asked how it would have affected the amount of Pontz's benefits, to which Aguayo responded that it would have "significantly reduce[d] the amount paid." The government later asked again whether Pontz's benefits would have been reduced had he reported that he lived with his wife, and Aguayo again responded yes over objection. Finally, the government elicited testimony from Aguayo that the lowest amount an SSDI beneficiary could receive was "somewhere around $100" per month, Lisa was an SSDI beneficiary, and Lisa's income would have reduced Pontz's benefit amount. The district court overruled Pontz's objections to that testimony but clarified that "no calculation or formula" would be admissible to further determine the SSA's loss amount.

The district court was well within its discretion in admitting this testimony. Indeed, it carefully policed the line between Rules 701 and 702. The government had initially intended for Aguayo to testify as to the precise loss-calculation amount. But after the district court's numerous evidentiary rulings that

either precluded or struck portions of Aguayo's testimony, only the statements we identify above remained.[6]

We disagree with Pontz that Aguayo's opinion that Lisa's income, if disclosed, would have impacted Pontz's benefits was inadmissible under Rule 701. The fact that Pontz's benefit amount would decrease if he reported another source of income was not a matter of technical knowledge. Prior testimony established that SSI benefits are needs-based supplemental income -- that is, they are available only if household income is otherwise insufficient. And the various SSA documents admitted into evidence made it clear that changes in living arrangements would affect the SSI benefit amount. The SSA's pamphlet stated that SSI benefits "depend[] on [the applicant's] other income and living arrangements" and instructed applicants to report changes in living arrangements and income sources. And the COLA letters stated that an applicant's

---

[6] To illustrate the district court's carefully calibrated approach, the government had at first asked Aguayo whether he had calculated the benefit loss amount, and Pontz objected. The district court then dismissed the jury, and questioning by the court and voir dire by Pontz's counsel ensued. Aguayo testified that he would be relying on his specialized training and knowledge of Social Security regulations and laws to inform his calculation. He also stated that if he had not been trained as an SSA claims technical expert, he would "probably not" have been able to calculate Pontz's correct SSI benefit amount.

The district court then sustained Pontz's objection to the loss-calculation testimony. It reasoned that because the testimony would not be "the product of reasoning familiar to the average person in everyday life," quoting Vega, 813 F.3d at 394, it could only come in through a properly qualified expert witness.

"income, other than any SSI payments, affects [the] SSI payment." There is no serious argument that Pontz's SSI benefit amount would increase or stay the same, rather than decrease, had he reported another source of household income. So Aguayo's opinion testimony that Pontz's benefits would have been reduced if he had reported Lisa's income is "the product of reasoning processes familiar to the average person in everyday life." Vega, 813 F.3d at 394 (quoting García, 413 F.3d at 215).

That leaves us with Pontz's objection to Aguayo's opinion that Pontz's SSI benefit amount would have been "significantly reduce[d]" if he had disclosed Lisa's income. Whether this opinion testimony is admissible under Rule 701 is a closer call. The district court concluded that it was, reasoning that it "did not include calculations" and instead reflected how a lay witness could "work in the field, at the job, seeing it every day," and make an educated guess about the SSA's loss.

Again, we see no abuse of discretion. Aguayo's opinion testimony was a rough estimate based on "straightforward logic" that Lisa's income would have had a significant impact on Pontz's benefits, so it would have been easy for the jury to "follow the reasoning process." Vega, 813 F.3d at 395. Thus, none of the district court's rulings ran afoul of Rule 701.

- 17 -

## 2. Hearsay

Pontz also contends that Aguayo's testimony referencing Lisa's SSDI benefits was impermissible hearsay because it was premised on his knowledge of her SSA file. As he points out, the government did not produce Lisa's file in discovery, and it was never entered into evidence. We review the district court's admission of this testimony over Pontz's hearsay objection for abuse of discretion. See United States v. Maldonado-Peña, 4 F.4th 1, 29 (1st Cir. 2021).

We conclude that any error in admitting Pontz's testimony about Lisa's SSA file, if there were one, was harmless. See id. at 30 (bypassing the admissibility issue because any error would have been harmless); United States v. Laureano-Pérez, 797 F.3d 45, 68 (1st Cir. 2015) (same). "Improperly admitted evidence is harmless if it is highly probable that the error did not influence the verdict." Maldonado-Peña, 4 F.4th at 30 (quotation marks and citation omitted).

Pontz argues that Aguayo's testimony influenced the verdict because the "sole evidence in the case that Pontz received an overpayment of SSI benefits during the period encompassed within the indictment was Aguayo's testimony to that effect." That is incorrect. Aguayo testified that an applicant's SSI eligibility is affected by the presence of a cohabitating spouse. And through the testimony of another witness, the government entered into

evidence a list written by Pontz, which he gave to his probation officer, indicating that Lisa's monthly benefits amounted to $1,107. The government also introduced a letter from SSA verifying that benefit amount.[7] Thus, even if the district court erred in admitting Aguayo's testimony as to Lisa's SSA file, the jury had independent documentary evidence showing that she received $1,107 in monthly SSDI benefits. Aguayo, by contrast, never mentioned the dollar amount of SSDI benefits that Lisa received. It is therefore highly probable that the admission of Aguayo's more oblique references to Lisa's benefits and eligibility did not influence the jury's verdict. And with none of Pontz's evidentiary challenges warranting reversal, we affirm the district court's admission of Aguayo's testimony in full.

## B.    Statute of Limitations

The statute of limitations for § 641 offenses is five years. See 18 U.S.C. § 3282(a). Pontz's indictment was returned on June 16, 2022, yet it charged Pontz with criminal conduct from May 2014 through June 2020.

---

[7] Pontz objected to the admission of the list because it included references to the fact that he was on probation for a state conviction, and the government agreed to introduce the list with those references redacted. Pontz also objected to the admission of Lisa's SSA letter on hearsay grounds. The district court overruled his objection, reasoning that it was a business record of the Massachusetts Department of Correction because Pontz had submitted Lisa's SSA letter to his probation officer. Pontz does not challenge that ruling on appeal.

Pontz argues that the government impermissibly charged him for a crime that occurred before the five-year time limit imposed by the statute of limitations.[8] He challenges the district court's denial of his motion to dismiss the indictment based on its ruling that § 641 embezzlement is a "continuing offense" as defined in Toussie, 397 U.S. at 115, such that the statute of limitations could be tolled to encompass Pontz's "single continuing scheme" of embezzlement. We review the district court's statute-of-limitations ruling de novo. See United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015).

We agree with Pontz. In this matter of first impression for our court, we hold that § 641 embezzlement is not a continuing offense and that the government was not permitted to charge Pontz

_____

[8] We pause here to clarify our use of the word "occurred." As discussed infra section II.B.1, a crime occurs as soon as all its elements are met. Felony embezzlement under § 641 requires four elements: (1) a thing of value of the United States that had lawfully come into the defendant's possession (2) has been knowingly converted (3) with improper intent, and (4) the thing of value is worth more than $1,000. See United States v. Torres Santiago, 729 F.2d 38, 40 (1st Cir. 1984).

When a § 641 felony embezzlement charge involves multiple transactions, like here, the elements of the offense are met once the first cent after $1,000 is embezzled. See United States v. Lee, 833 F.3d 56, 67 (2d Cir. 2016) (concluding, in a Grand Jury Clause challenge to the indictment, that "valuation in excess of $1,000 . . . is an element of the § 641 felony offense"); cf. also Carter v. United States, 530 U.S. 255, 273 (2000). Because under the government's own theory of the case, Pontz had embezzled more than $1,000 before June 16, 2017, we say that the indictment charged him for a crime that had "occurred" before that date.

with a crime that occurred before June 16, 2017.  Accordingly, we vacate the restitution and forfeiture orders and remand to the district court to determine if any further relief is warranted.

## 1.   § 641 Embezzlement

We begin with the text of § 641 and a review of the continuing-offense doctrine.

Section 641 broadly prohibits the theft of government money.  It reads in relevant part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof . . .
>
> Shall be fined under this title or imprisoned not more than ten years, or both . . . .

18 U.S.C. § 641.  If the value at issue does not exceed $1,000, then the defendant "shall be fined or imprisoned not more than one year, or both."  Id.

One of the methods of theft covered by § 641 is embezzlement.[9]  "Embezzlement is the fraudulent appropriation of property by a person to whom such property has been intrusted, or into whose hands it has lawfully come."  Moore v. United States,

---

[9] The government does not argue that the statute's other methods of theft could constitute continuing offenses. See, e.g., United States v. Askia, 893 F.3d 1110, 1116 (8th Cir. 2018) (noting that larceny of public money is an "easy example" of a non-continuing offense).

160 U.S. 268, 269 (1895). "It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking." Id. at 269-70. For instance, when a defendant "misappropriat[es] . . . government resources to his own behoof," he commits embezzlement. United States v. George, 886 F.3d 31, 40 (1st Cir. 2018). A felony conviction for § 641 embezzlement therefore generally requires the government to prove that (1) a thing of value of the United States that had lawfully come into the defendant's possession (2) has been knowingly converted (3) with improper intent, and that (4) the thing of value is worth more than $1,000. See 18 U.S.C. § 641; United States v. Torres Santiago, 729 F.2d 38, 40 (1st Cir. 1984). The statute's penalty provision allows the government to "combin[e] amounts from all the counts for which the defendant is convicted in a single case" to satisfy the $1,000 element. 18 U.S.C. § 641.

Embezzlement can occur in one transaction or over a series of transactions. If an embezzlement occurs over a series of transactions, the indictment may charge a violation of § 641 either in one count or in multiple counts for each transaction. We have made clear that "embezzlement, by its very nature, contemplates that several separate transactions may form a single, continuing scheme, and may therefore be charged in a single count."

- 22 -

United States v. Daley, 454 F.2d 505, 509 (1st Cir. 1972); see also United States v. Yashar, 166 F.3d 873, 878-79 & n.2 (7th Cir. 1999) (noting that "[a] prosecutor has a great deal of discretion in deciding whether to charge a course of conduct as a single offense or as multiple offenses," subject "to some extent by principles of duplicity, multiplicity, and double jeopardy"). But as we explain later, see infra section II.B.3, not every continuing scheme is a "continuing offense."

## 2. Continuing-Offense Doctrine

The statute of limitations for most federal noncapital offenses, including offenses under § 641, is five years. See 18 U.S.C. § 3282(a). The limitations period normally begins to run when a crime is complete. See Toussie, 397 U.S. at 115. And ordinarily, a crime is complete once "every element of the crime has been accomplished." United States v. Walsh, 928 F.2d 7, 11 (1st Cir. 1991). There is a different timing rule, however, for so-called "continuing offenses." "For those crimes, the statute of limitations does not begin to run when all elements are first present, but rather begins when the offense expires." Yashar, 166 F.3d at 875-76.

A continuing offense is a crime that "perdures beyond the initial illegal act, and . . . 'each day brings a renewed threat of the evil Congress sought to prevent' even after the elements necessary to establish the crime have occurred." Id. at

- 23 -

875 (quoting Toussie, 397 U.S. at 112)).  As the Seventh Circuit explained in Yashar, "continuing offense" "is a term of art, and does not merely mean an offense that continues in a factual sense." Id.

Conspiracy and kidnapping are classic examples of continuing offenses.  See Toussie, 397 U.S. at 122; United States v. Kissel, 218 U.S. 601, 608 (1910); cf. also United States v. Rodriguez-Moreno, 526 U.S. 275, 282 (1999) (explaining that kidnapping is committed "in all of the places that any part of it took place" and is a "continuing offense[]" for venue purposes). For instance, even after all the elements of kidnapping are met -- (1) seizure of the victim, (2) holding the victim against the victim's will for any purpose, and (3) intentional transportation across state lines -- the "evil" of kidnapping continues each day and "does not end until the victim is free." Rodriguez-Moreno, 526 U.S. at 281; see also 18 U.S.C. § 1201(a)(1).

But beyond these classic examples of continuing offenses, whether a particular crime is a continuing offense is not always obvious.  The Supreme Court has held that a crime can qualify as a continuing offense in one of two ways: Either "[1] the explicit language of the substantive criminal statute compels such a conclusion, or [2] the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."  Toussie, 397 U.S. at 115.  As the Supreme

- 24 -

Court's holding makes clear, the Toussie test focuses on statutory language and congressional intent.

Toussie also cautions that "the doctrine of continuing offenses should be applied in only limited circumstances." Id. at 115. That is because an overbroad application of the continuing-offense doctrine would undermine congressional policy to "protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." Id. at 114-15 (noting, in addition, "the salutary effect of encouraging law enforcement officials" to investigate crimes "promptly"). Thus, when there is no explicit direction from Congress in a statute's text, we must tread carefully before concluding that a crime is a continuing offense under Toussie's second prong. See id. (noting that statutes of limitation must "be liberally interpreted in favor of repose").

### 3. § 641 Embezzlement Is Not a Continuing Offense

We now turn to the specifics of Pontz's challenge. To determine whether § 641 embezzlement is a continuing offense, we apply Toussie's two-pronged inquiry and ask (1) whether the explicit language of § 641 compels that conclusion, or (2) whether the nature of embezzlement is "such that Congress must assuredly have intended" that § 641 embezzlement be treated as a continuing

- 25 -

offense.  397 U.S. at 115.  Because neither prong is satisfied here, we conclude that § 641 embezzlement is not a continuing offense.

Pontz and the government agree that § 641 embezzlement is not a continuing offense under Toussie's first prong because there is no explicit language in the statute's text that compels that conclusion.[10]  The focus of our inquiry is therefore Toussie's second prong, which turns on the nature of § 641 embezzlement and congressional intent.  The parties also agree that we must evaluate the nature of the offense as a categorical matter, without considering Pontz's particular conduct or the way that the government charged the crime.

We hold that, by its nature, § 641 embezzlement is not a continuing offense.  We reach this conclusion for three reasons. First, we look to the "substantive evil" underlying the crime of

_____

[10] Section 641 lacks the language found in other statutes that expressly designate crimes as continuing offenses.  See, e.g., 22 U.S.C. § 618(e) ("Failure to file any such registration statement or supplements thereto . . . shall be considered a continuing offense for as long as such failure exists, notwithstanding any statute of limitation or other statute to the contrary."); 18 U.S.C. § 3284 ("The concealment of assets of a debtor in a case under title 11 shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied, and the period of limitations shall not begin to run until such final discharge or denial of discharge.").  Nor does the text of § 641 necessarily imply that the offense is continuing.  See United States v. Kerley, 838 F.2d 932, 935 (7th Cir. 1988) (concluding that the text of the new draft registration statute, amended after Toussie, must imply a "continuing duty to register").

embezzlement and conclude that it does not necessarily continue, even after the elements of the crime are met. Second, we survey § 641's text, amendment history, and legislative history to test our conclusion, just like the Supreme Court did with the relevant statute in Toussie. None of these sources point to Congress's intent to treat § 641 embezzlement as a continuing offense. Third, we review the decisions of our sister circuits and agree with the majority approach, which rejects embezzlement as a continuing offense.

To begin, we focus on the "substantive evil" underlying embezzlement. Embezzlement occurs at a discrete point in time: the moment that money is converted to the defendant's use. See United States v. Niven, 952 F.2d 289, 293 (9th Cir. 1991) (holding that wire and mail fraud were not continuing offenses because "[e]ach offense is complete when the fraudulent matter is placed in the mail or transmitted by wire, respectively"), overruled on other grounds by United States v. Scarano, 76 F.3d 1471, 1477 (9th Cir. 1996). We know that to be true because § 641 embezzlement can be committed in one fell swoop, in a single transaction. See, e.g., Torres Santiago, 729 F.2d at 40 (one act of cashing social security checks). And the government can obtain an indictment charging a defendant under § 641 for that single act of embezzlement. Once that single act is complete, and the elements of embezzlement are met, there is no renewed, daily harm from the

defendant's illegal conduct. Thus, the nature of § 641 embezzlement, as a categorical matter, is not continuing.

In our view, that an embezzlement scheme like Pontz's can encompass multiple transactions, as opposed to a single transaction, does not transform embezzlement into a continuing offense by its nature. Even with an embezzlement scheme, the harm occurs episodically -- each time that the defendant embezzles money. In between each discrete act, there is no ongoing "evil" in the sense of, for instance, a kidnapping where the victim remains in jeopardy until they are released or a prison escape where the convict remains at large each day they elude federal custody. See Rodriguez-Moreno, 526 U.S. at 282 (kidnapping); United States v. Bailey, 444 U.S. 394, 413 (1980) (escape). An embezzlement scheme is therefore better understood as "a cinematographic series of distinct [embezzlements]." Kissel, 218 U.S. at 607.

Contrary to the government's argument, our decision in Daley, which concerned embezzlement, does not compel a different outcome. To be sure, in Daley we reasoned that "embezzlement, by its very nature, contemplates that several separate transactions may form a single, continuing scheme, and may therefore be charged in a single count." 454 F.2d at 509. But the defendant in that case challenged the indictment for duplicity, not for running afoul of the statute of limitations. See id. And those two inquiries

are fundamentally distinct. A count is duplicitous if it joins "in a single count[] two or more distinct offenses," and the bar against duplicitous counts is meant to ensure that defendants receive notice of the crimes with which they are charged and that juries convict only when they are unanimous as to each count. United States v. Prieto, 812 F.3d 6, 11 (1st Cir. 2016). Daley's holding, then, must be understood to mean that combining multiple embezzlements into one count does not trigger any improper duplicity or notice concerns. We see no basis to extend that holding to suggest that the harm from § 641 embezzlement schemes continues even after the elements of the crime are met, like in kidnapping or conspiracy. See United States v. Jaynes, 75 F.3d 1493, 1506 (10th Cir. 1996) (noting that "continuing offense" "is a term of art" and "is not the same as a scheme or pattern of illegal conduct").

Second, we evaluate the text, amendment history, and legislative history of § 641 and conclude that none of these sources indicate that Congress "must assuredly have intended" to treat embezzlement as a continuing offense. See Toussie, 397 U.S. at 116-19 (reviewing statutory text and prior versions of the statute); United States v. Figueroa-Cartagena, 612 F.3d 69, 80 (1st Cir. 2010) (opinion of Lipez, J.) (reviewing legislative history "to the extent that the legislative history may shed light on Congress's intent" in considering whether carjacking is a

"continuing" crime for the purposes of determining accomplice liability).

Beyond including the word "embezzles," the text of § 641 says little about the nature of embezzlement for statute-of-limitations purposes. It does, however, contain a penalty provision, which states that a defendant violating § 641:

> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 641.

The government argues that the penalty provision reflects congressional intent to treat § 641 embezzlement as a continuing offense, but we disagree. The provision specifies how the government can meet the $1,000 element for felony embezzlement, but it says nothing about the continuing nature of the crime even after that element is met, which is the critical inquiry, and does not otherwise "contemplate[] a prolonged course of conduct," Toussie, 387 U.S. at 120. And if we read the penalty provision to indicate that § 641 embezzlement were a continuing offense, that reading would have to apply to all methods of theft under § 641, which extends to anyone who "embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without

- 30 -

authority, sells, conveys or disposes" public money, property, or records. 18 U.S.C. § 641. That interpretation runs into obvious problems. "[I]t is well established that offenses such as stealing, theft, and larceny are completed [not continuing] offenses." United States v. Askia, 893 F.3d 1110, 1116 (8th Cir. 2018); United States v. McGoff, 831 F.2d 1071, 1078 (D.C. Cir. 1987) (noting, for larceny, that "[t]he crime is complete when the act is complete").[11]

What is more, the legislative history does not indicate that Congress was thinking about the continuing-offense exception when it added the penalty provision to § 641. Congress amended the penalty provision in 2004 to expressly permit the government to aggregate the value of embezzled property to meet the $1,000 element required for a felony conviction. See Identity Theft Penalty Enhancement Act, Pub. L. No. 108-275, § 4, 118 Stat. 831, 833 (2004). That change was intended to address "a split among the Federal district courts as to whether 18 U.S.C. § 641 allows such aggregation," noting that the "most common instance in which this has been a problem is in the improper receipt of monthly

---

[11] The Fourth Circuit has suggested that the "trespass in the taking" inherent to larceny would prevent it from being continuing by nature, as opposed to embezzlement, which can comprise multiple takings stemming from one initial lawful acquisition. United States v. Smith, 373 F.3d 561, 567 (4th Cir. 2004) (per curiam). We respectfully disagree with the analysis in Smith. See infra text accompanying note 15.

Federal benefits . . . . less than $1,000." H.R. Rep. No. 108-528, at 11 (2004). Congress clearly intended for cases like Pontz's to be chargeable as felonies, but it said nothing about the applicable statute of limitations. "[I]t seems," then, "that Congress was simply not thinking about" extending the statute of limitations for § 641 embezzlement when it amended the statute's penalty provision. Figueroa-Cartagena, 612 F.3d at 80 (opinion of Lipez, J.).

Further, no version of the embezzlement statute, dating to the original federal statute in 1875, sheds light on the appropriate statute-of-limitations rule for § 641. See Act of March 3, 1875, ch. 144, § 1, 18 Stat. 479, 479; Conspiracy Act, Pub. L. No. 60-350, § 47, 35 Stat. 1088, 1097 (1909); Act of June 25, 1948, Pub. L. No. 80-772, § 641, 62 Stat. 683, 725; cf. also Toussie, 397 U.S. at 116-19 (examining the statute's amendments over time to conclude that the law did not establish a continuing offense). In short, nothing about how Congress drafted § 641 or how the statute has changed over time indicates that Congress intended to treat § 641 as a continuing offense. See Toussie, 397 U.S. at 115.

Third, the majority of our sister circuits to have confronted the issue have concluded that embezzlement is not a

continuing offense under Toussie.[12]  Those courts have relied on

many of the same factors that we have considered here in reaching

their rulings.  See United States v. Green, 897 F.3d 443, 449 (2d

Cir. 2018) (§ 641 embezzlement); Askia, 893 F.3d at 1118 (§ 666

embezzlement);[13] see also Yashar, 166 F.3d at 873 (18 U.S.C. § 666

embezzlement).[14]  For example, in Yashar, the Seventh Circuit

explained that it would be a mistake to consider any scheme that

can extend over a period of time to be a continuing offense.  See

166 F.3d at 878-79.  Otherwise, a hypothetical "ghost payroller

_____

[12] District courts in our circuit also have had occasion to decide whether § 641 is a continuing offense and have reached different conclusions.  Compare United States v. Powell, 99 F. Supp. 3d 262, 267 (D.R.I. 2015) (not continuing offense), with United States v. Daley, 537 F. Supp. 3d 116, 119 (D. Mass. 2021) (continuing offense).

[13] The parties agree that embezzlement under § 641 and § 666 are "closely related" offenses, Green, 897 F.3d at 449, and we regard the crimes as interchangeable for the purposes of the Toussie analysis.

[14] We pause to note that in Yashar, the government conceded that § 666 was not a "continuing offense."  166 F.3d at 876.  Thus, strictly speaking, the dispute in Yashar focused on when the statute of limitations should begin to run for "a scheme" that involved a "continuing course of conduct" in violation of § 666. As the Seventh Circuit recognized, however, the government in that case was simply relying on a different label, "continuing course of conduct" instead of "continuing offense," to seek the same outcome, the tolling of the statute of limitations.  Id. at 877 (explaining that "[t]he government's argument . . . would treat a continuing course of conduct or scheme the same as a continuing offense under Toussie" and criticizing the government for attempting to "add" a third prong to the Toussie test). Thus, we interpret Yashar as holding that violations of § 666 are not excepted from the general rule that the statute of limitations begins to run when the crime is complete.

[who] received $15,000 in salary in 1970 and, 25 years later, received $300 in retirement benefits attributable to that sham employment" could have been prosecuted in 2000 for a scheme spanning thirty years. Id. at 879. That result would undermine the purpose of statutes of limitations -- "to discourage prosecution based on facts obscured by the passage of time, and to encourage law enforcement officials promptly to investigate suspected criminal activity." Id. (citing Toussie, 397 U.S. at 114-15).

The Fourth Circuit is the only federal court of appeals to date to hold that embezzlement is a continuing offense. See Smith, 373 F.3d at 563. In Smith, the court concluded that "Congress must have intended that, in some circumstances, [embezzlement] be treated in section 641 as a continuing offense." Id. at 564. It further explained:

> Embezzlement is the type of crime that, to avoid detection, often occurs over some time and in relatively small, but recurring, amounts. . . . At least in those cases where the defendant created a recurring, automatic scheme of embezzlement under section 641 by conversion of funds voluntarily placed in the defendant's possession by the government, and maintained that scheme without need for affirmative acts linked to any particular receipt of funds -- cases in which there is a strong "temporal relationship between the [completion of the] offense and culpability," United States v. Blizzard, 27 F.3d 100, 103 (4th Cir. 1994) -- we think that Congress must have intended that such be considered a

continuing offense for purposes of the statute
of limitations.

Id. at 567-68 (citation omitted). But see id. at 569 (Michael, J., dissenting) (reasoning that "whether an offense is continuing in nature does not change depending on the manner in which the offense is committed," and emphasizing that "the fact that embezzlement can be completed in one distinct transaction undermines the notion that it is inherently a continuing crime"). The government urges us to adopt the Smith majority's reasoning.

Respectfully, we disagree with the reasoning in Smith. Smith held that "recurring, automatic scheme[s] of embezzlement" were continuing offenses, but embezzlements involving "affirmative acts linked to . . . particular receipt of funds" were not. Id. at 567-68. But Smith's test, which hinges on whether a particular embezzlement involved "automatic" or "affirmative" actions, requires looking at the defendant's conduct. And that kind of inquiry would be in tension with Toussie's focus on statutory language and "examin[ation] [of] the offense itself, not the defendant's particular conduct." United States v. Tavarez-Levario, 788 F.3d 433, 440 (5th Cir. 2015); see also, e.g., Askia, 893 F.3d at 1117; Green, 897 F.3d at 449; Yashar, 166 F.3d at 877; Jaynes, 75 F.3d at 1506; Niven, 952 F.2d at 293.[15] As the

---

[15] The government also suggested at oral argument that embezzlement has long been understood under state law to be

- 35 -

Seventh Circuit succinctly explained, an analysis that focuses on whether a defendant's actions amount to a continuing course of conduct "would largely swallow the second factor of Toussie . . . . The focus would no longer be on Congress'[s] wording and intent, but on the conduct charged by the prosecutor and the language of the indictment in a particular case." Yashar, 166 F.3d at 877.

Finally, although we do not find § 641's text, including the penalty provision, to be ambiguous, even if it were, we would need to resolve that ambiguity in Pontz's favor. "Every statute of limitations, of course, may permit a rogue to escape." Toussie, 397 U.S. at 123-24 (quoting Pendergast v. United States, 317 U.S. 412, 418 (1943)). But the congressional intent behind statutes of

---

continuous in nature, and Congress legislated against that backdrop. That reasoning echoes Smith, which cited to MacEwen v. State, a Maryland Supreme Court case noting that "[w]hile embezzlement is sustained by the diversion of a single sum of money at a particular time, in many cases it runs for a long period of time and consists of converting different sums of money on many dates to the use of the thief." 71 A.2d 464, 468-69 (Md. 1950); see also Smith, 373 F.3d at 567.

Although we do not undertake a comprehensive survey of state law on embezzlement, we note that MacEwen did not involve a statute-of-limitations challenge. See 71 A.2d at 467-69 (deciding whether evidence of embezzlement could be admitted in order to establish common motive for the charged crime of false pretenses). And as we have explained, the ability to aggregate related embezzlements into one crime says nothing about whether the crime nevertheless "continues" for statutes-of-limitations purposes after that element is met. See Kissel, 218 U.S. at 607 (distinguishing between a "cinematographic series of distinct" crimes and a single one).

limitations and the rule of lenity counsel against the government's interpretation. See id. at 115. Accordingly, we hold that § 641 embezzlement does not qualify as a continuing offense under Toussie. The five-year statute of limitations for this crime begins to run after the elements for felony or misdemeanor embezzlement are met.

Because § 641 embezzlement is not a continuing offense, the government was not permitted to charge Pontz with a crime that occurred before June 16, 2017. The government could have charged Pontz with embezzlement either through multiple counts or in one count aggregating all the monthly SSI payments. See Daley, 454 F.2d at 509; Yashar, 166 F.3d at 878-79 & n.2. But either way, it could only charge him for a crime that occurred on or after June 16, 2017.

That does not mean, however, that each transaction underlying a § 641 felony embezzlement must have taken place after June 2017. The statute of limitations begins to run once all elements of the offense are met. See Yashar, 166 F.3d at 879-80. And the $1,000 threshold is one of the elements of a § 641 felony. See Torres Santiago, 729 F.2d at 40; see also United States v. Lee, 833 F.3d 56, 67 (2d Cir. 2016). Thus, the statute of limitations for a § 641 felony begins to run once the first cent after $1,000 is embezzled. So even if dollars one through 1,000 were embezzled more than five years before the indictment's filing,

the government may still prosecute a § 641 felony so long as the first cent after $1,000 was embezzled within the five-year window. See Yashar, 166 F.3d at 880 (remanding to the district court to determine whether the monetary minimums of 18 U.S.C. § 666 were met within the five years preceding the indictment).[16]  That said, once the elements of a § 641 felony are met, the statute of

_____

[16] Yashar raises a related issue.  It might be read to suggest that a § 641 felony committed before the limitations period would preclude a § 641 felony charge for a crime committed within the limitations period.  See Yashar, 166 F.3d at 880 (explaining that if the § 666 monetary minimums were met more than five years before the indictment, "such that the government could have proceeded with criminal charges prior to that date, then the indictment in this case was not timely").

Askia disagreed with that prosecute-it-or-lose-it approach, and so do we.  See 893 F.3d at 1119-20.  Consider a hypothetical defendant who escapes detection until five years after he commits a § 641 felony.  If he continues his embezzlement scheme, under Yashar he is arguably immunized from any § 641 felony charge targeting the same scheme.  Whereas barring prosecution for the earlier § 641 felony advances Congress's interests in repose for "acts in the far distant past" and in prompt investigation, barring prosecution for the more recent § 641 felony does not.  Toussie, 397 U.S. at 115.  And seeing no other statutory or constitutional reason to apply Yashar's approach, we decline to adopt it.  See also Askia, 893 F.3d at 1120 (holding that the government is still "free to charge and prosecute any . . . violations committed within the limitations period"); Lee, 833 F.3d at 67 (holding that the $1,000 minimum is an element of the § 641 felony offense).

Finally, we add that this case is not like the hypothetical posed in Yashar, "in which a ghost payroller received $15,000 in salary in 1970 and, 25 years later, received $300 in retirement benefits attributable to that sham employment."  166 F.3d at 879. A § 641 felony charge on those facts is likely to be rare and might suffer from legal and evidentiary impediments of its own.

limitations begins to run "regardless of whether the defendant continues" to embezzle money. Yashar, 166 F.3d at 879-80.

Thus, we reverse the district court's ruling permitting the government to charge Pontz with a § 641 felony that occurred before June 16, 2017.

### 4. Remedy

Having concluded that Pontz's statute-of-limitations challenge has merit, we now turn to remedy. Pontz requests that we vacate the restitution and forfeiture orders below, which included the SSA's loss preceding June 16, 2017, and that we reverse his conviction. We agree that we must vacate the monetary penalties, but we remand to the district court to decide whether Pontz's conviction can stand.

We begin with the restitution and forfeiture orders. Absent a plea agreement, a restitution award may be authorized only for "the loss caused by the specific conduct that is the basis of the offense of conviction." United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002) (quoting Hughey v. United States, 495 U.S. 411, 413 (1990)). The parties agree that the restitution and forfeiture orders here include the entirety of the SSA's loss caused by Pontz's conduct before June 16, 2017.

Because of our holding that § 641 embezzlement is not a continuing offense, we vacate the restitution and forfeiture orders. See id. That said, the restitution and forfeiture amounts

may include up to $1,000 in losses preceding June 16, 2017, so long as those losses were caused by transactions that are part of a § 641 felony that occurred on or after June 16, 2017.[17]

Moving to the remedy for the statute-of-limitations error, neither party has presented developed argument on this point. Pontz contends in one sentence of his brief that the indictment is "fundamentally[] flawed" because § 641 embezzlement is not a continuing offense and that "Pontz's resulting conviction on that defective indictment cannot stand," but he cites no authority for his position. Further undermining Pontz's argument that his conviction cannot stand is that his motion to dismiss the indictment requested dismissal of the indictment only "insofar as it alleges criminal conduct occurring prior to June 16, 2017." We also note that under a prejudicial variance analysis,[18] if the

---

[17] Here, we differ from the Second Circuit's approach in Green, which held that the district court was "not permitted to order restitution" outside the limitations period in a § 641 case. 897 F.3d at 450; see also United States v. Silkowski, 32 F.3d 682, 687 (2d Cir. 1994) (permitting the district court, following defendant's § 641 plea, to consider all nine years of fraudulent receipt of SSI for sentencing purposes but only the five years preceding the indictment for restitution purposes). Again, we note that the crime at issue in this case is a § 641 felony, not some base § 641 offense. See Lee, 833 F.3d at 67.

[18] A variance "occurs when the government relies at trial on different facts than those alleged in the indictment to prove the same offense." United States v. Katana, 93 F.4th 521, 530 (1st Cir. 2024). A variance does not require reversal unless it is prejudicial, meaning that it "affects the defendant's substantial rights, i.e., the right to have knowledge of the charge sufficient to prepare an effective defense and avoid surprise at trial, and

government had proceeded to prove at trial a scheme from 2017 to 2020 instead of 2014 to 2020, it would have "add[ed] nothing new to the grand jury's indictment" but rather established "a significantly narrower and more limited, though included, fraudulent scheme." United States v. Mubayyid, 658 F.3d 35, 50 (1st Cir. 2011) (quoting United States v. Miller, 471 U.S. 130, 131, 144-45 (1985)).

The government, for its part, responds that "the appropriate remedy is to remand to the district court to determine in the first instance whether Pontz violated § 641 and received a total sum greater than $1,000 within the limitations period." But, like Pontz, it provides no analysis to support its position. At oral argument, the government also contended that Pontz conceded below that any statute-of-limitations error in including the pre-2017 conduct in the indictment would not require vacating his conviction, pointing to Pontz's motion for release and a stay of sentence pending appeal. In that motion, Pontz argued that the question of whether § 641 embezzlement is a continuing offense is a substantial question of law likely to result in either reversal or a new trial. During the hearing on the motion, however, his

---

the right to prevent a second prosecution for the same offense." Id. (quoting United States v. Vega-Martínez, 949 F.3d 43, 51 (1st Cir. 2020)).

counsel stated that resolution of "the statute of limitations issue . . . would only impact the restitution amount."

A "litigant has an obligation 'to spell out its arguments squarely and distinctly.'" United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)). Neither party has done so here on the remedy issue. Thus, we remand to the district court, so that it may determine in the first instance the impact of our ruling on the validity of Pontz's conviction with the benefit of its familiarity with the trial proceedings and any alleged concession by Pontz's counsel after trial.[19] If the district court concludes that Pontz's conviction may stand, then it should redetermine the restitution and forfeiture amounts.

---

[19] We take no view on whether the trial evidence is sufficient to support a § 641 felony conviction for conduct within the indictment's five-year window. See Jaynes, 75 F.3d at 1507 (affirming conviction where there was "ample evidence" of check forgery within the five-year window and noting that "ordinarily, proof that an offense was committed on any day before the finding of the indictment and within the statute of limitations is sufficient to support a conviction" (citing Ledbetter v. United States, 170 U.S. 606, 612 (1898)); Askia, 893 F.3d at 1120 (holding that proof of expenditures within the five-year window supported the conviction and noting that "[a]n indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted" (quotation marks and citation omitted)).

## III.    CONCLUSION

We **reverse** the district court's denial of Pontz's motion to dismiss the indictment in part, **vacate** the restitution and forfeiture orders, and **remand** to the district court for further proceedings consistent with this opinion.